JOHN F. PROCTOR *vs.* MAINE CENTRAL RAILROAD CO.

Cumberland.    Opinion July 1, 1902.

*Deed.  Boundary.  Flats.  Upland.  Shore.  Bank.  Evidence.  Ancient
Records.  Colonial Ordinance, 1641–7,*

1.  By virtue of the Colonial Ordinance of Massachusetts, 1641-7, the owner of upland adjoining tide-water owns to low water mark, not exceeding one hundred rods from high water mark.

2.  Such an owner may separate the flats from the upland, and convey the one and retain the other.

3.  Flats pass by a grant of the upland, unless they are excluded by the terms of the grant.

4.  In construing a grant, effect is to be given, if possible, to the intention of the parties.

5.  Ordinarily the intent which is effective in a grant is the intent expressed in the language of the grant, and such intent is ascertained by giving suitable effect to all the words of the grant, read in the light of the circumstances attending the transaction, the situation of the parties, the state of the country and of the estate granted, such as its condition and occupation.

6.  Ancient records of towns and proprietors which tend to throw light upon the intention of the parties to a grant in any of the before mentioned particulars may be admissible and relevant when such intention is in issue.

7.  Whether such records so far as they relate to transactions with persons other than the owner of the land in question, or to lots of land which were neither contiguous to, nor in any way connected with the lot whose title is in issue, are admissible to show the intent of the parties with respect to the grant of the latter lot, quære.

8.  It being claimed that such records offered in this case do show historically and by reference to the terms of the original grants, by vote and by other proceedings of the town and the proprietors, that in the distribution of upland along Fore river, by the town of Falmouth and the proprietors of Falmouth, the town and the proprietors treated the flats as reserved for common property, and that flats were not conveyed or intended to be conveyed by grants of upland, the court is of opinion that these records do not show any such general intent in 1721, the date of the grant particularly in question,—certainly not as affecting the flats adjacent to the lot described in this grant, nor those in the immediate vicinity, whatever may have been the intent afterwards, and as to other places on Fore river.

9. *Held;* that, by the grant by the inhabitants of Falmouth to Deborah Mills in 1721, of "the first thirty acre lot toward the Round Cove as it is now laid out, with a road to be allowed upon the bank, front thirty rod, and northeast and by east into the woods eight score rod," the adjacent flats did pass to the grantee and that the demandant, who is her successor in title, has shown a better record title than the tenant has to so much of those flats as is embraced by the demanded premises.

10. *Held;* that, by the grant by the inhabitants of Falmouth to James Dueneven in 1729 of a lot with the following boundaries : — "Beginning at a white oak stump adjoyning on James Mills thirty acre lot and thence" by sundry courses "till it comes to the Cove or Marsh and thence round by the bank to the first bounds mentioned," the flats adjacent to the upland described are expressly excluded by the terms of the grant properly construed, and did not pass to the grantee; that the demandant, claiming title under the grant to Dueneven has shown no record title to any of the flats adjacent to the Dueneven lot, and that the tenant in possession, holding under a warrantee deed expressly conveying those flats, has the better record title thereto.

11. The word "bank" in the Dueneven grant, though not strictly appropriate to land adjacent to tidal waters, is to be construed in this connection after the analogy of its use in relation to fresh water streams, meaning, not the shore, but the land adjacent to the shore.

12. In the Dueneven grant, the "bank" was a definite monument, and the phrase "round by the bank" marked the specific boundary of the Dueneven lot on the seaward side.

On report. Remanded to nisi prius.

Real action to recover two parcels of tide lands or flats in Portland.

The plea was the general issue of nul disseizin.

After both parties had introduced their evidence relative to the record title of each to the lots described in demandant's declaration, the case, by agreement of parties, was withdrawn from the jury and reported.

By the terms of the report the court was to decide the question as to which of the parties has the better record title to the demanded lots. If the court should decide that question in favor of the defendant, judgment for defendant to follow ; if in favor of demandant, the case to be remanded to nisi prius, to be tried upon the defendant's claim of title by adverse possession. The facts are stated in the opinion.

*C. P. Mattocks*; *W. K. and A. E. Neal*, for plaintiff.

Counsel argued : That the phrase, "as Fore river runs," or "by Fore river," carries the flats. *Brackett* v. *Persons Unknown*, 53 Maine, 238, 245, 87 Am. Dec. 548; *Pike* v. *Munroe*, 36 Maine 309, 58 Am. Dec. 751 ; *Winslow* v. *Patten*, 34 Maine, 25.

After a court has given to a statute a construction, title acquired in pursuance of such construction ought not to be disturbed. *Folger* v. *Mitchell*, 3 Pick. 400.

The shore may also pass under the term "ripa" or "bank." Gould on Waters, 2d Ed. c. 1, § 28 ; *Morrison* v. *First Nat'l Bank*, 88 Maine, 155 ; *Starr* v. *Child*, 20 Wend. 149 ; *Child* v. *Starr*, 4 Hill, 369 ; *In re Belfast Dock*, Ir. Rep. Eq. 128, 139.

The title in the case at bar passed from the inhabitants of Falmouth to the original settlers in 1720 and 1721. Great liberality in construing these old grants is to be exercised in favor of the grantee. *Adams* v. *Frothingham*, 3 Mass. 352, 3 Am. Dec. 151.

Flats are included in a conveyance bounded "by the harbor," *Mayhew* v. *Norton*, 17 Pick. 357, 359, 28 Am. Dec. 300; or "by the sea or salt water," *Green* v. *Chelsea*, 24 Pick. 77; or "by the sea," *Jackson* v. *Boston & Worcester R. R.*, 1 Cush. 575; *Saltonstall* v. *Long Wharf*, 7 Cush. 200; or "by the creek," *Harlow* v. *Fisk*, 12 Cush. 302; or "on the stream," *Lapish* v. *Bangor Bank*, 8 Greenl. 92, 93; or "river," *Moore* v. *Griffin*, 22 Maine, 350; or "bay," *Partridge* v. *Luce*, 36 Maine, 19; or "by the sea or harbor," *Litchfield* v. *Scituate*, 136 Mass. 39; or "to the water," or "to the river," *Babson* v. *Tainter*, 79 Maine, 368.

In *Nickerson* v. *Crawford*, 16 Maine, 245, the boundary was "to and along the margin of the cove," and it was held that the flats were excluded by the use of the word "margin."

In *Rust* v. *Boston Mill Corp.*, 6 Pick. 166, the real boundary was "by a cliff," which excluded the flats.

In a case where ambiguous terms were used, as "on the sea or flats," or "by the sea or beach," the court construed favorably to the grantee, and held that the flats passed. *Saltonstall* v. *Long Wharf*, 7 Cush. 195.

A grant by a town under the colonial ordinance of land next tide-water passes the fee in the flats in front thereof.   *Boston* v. *Richardson*, 105 Mass. 351; *Sewall & Day Cordage Co.* v. *Boston Water Power Co.*, 147 Mass. 61.

*J. W. Symonds, D. W. Snow and C. S. Cook*, for defendant.

Counsel premised their argument with the following historical sketch:

At the close of the French and Indian wars, the town of Falmouth, or Casco, as it was then called, was practically obliterated.   The town had been several times destroyed, and its inhabitants had been killed or scattered among the adjoining settlements.   Early in the last century a few of the inhabitants returned and took possession of the land, locating as nearly as possible upon the former site of the town. In 1717 these inhabitants petitioned to the Great and General Assembly of the Province of Massachusetts for the appointment of a committee to define the limits of the town and to recommend some form of town government.   The petition was granted, and a committee was appointed, which reported in 1718, establishing the boundary lines and it was ordered "that the inhabitants of said town that now are or hereafter shall be, from time to time, invested with the same powers and authorities, to act, manage, direct and order the affairs of said township as other towns are; provided that this order shall in no wise prejudice or infringe any just right or title that any person have to lands there; and that fifty families at least more than now are to be admitted as soon as may be and settle." Taking advantage of this act, the few inhabitants who were then located near or upon the site of the old town met March 10, 1718, and proceeded to organize by the election of officers and the appointment of committees.

So far as real property was concerned, all was confusion; lines were uncertain and rights undetermined, and it was found necessary to take immediate steps to protect the interests of the inhabitants who were then in the town, and to provide for the interests of those who might settle in the future.   Among the matters provided for at this time was the division of the common lands in the vicinity, a vote being passed at this first meeting that lots should be laid out

upon the three or four highways which had been determined upon, and that a committee should be appointed for that purpose. Each inhabitant was to have a one acre lot, a three acre lot, a ten acre and thirty acre lot. Later it was voted that if the land should hold out, each inhabitant should receive a sixty and a hundred acre lot. The committee at once proceeded to lay out lots, in accordance with this vote, and from time to time the doings of this or similar committees were ratified and approved by the town. The layings out made by these committees were generally in form of grants from the town. In some instances, however, grants were made by votes of the town or of the proprietors. The language of these old grants is not always clear, and it is somewhat difficult to get at the exact meaning, but it is evident that the intention was to provide a house lot and sufficient land for farming or grazing purposes for each inhabitant, and later on to divide the remaining common lands as fairly as could be. Shortly after the town began to make these grants, the ancient proprietors, as they were called, in other words, those who had occupied the land prior to the destruction of the town by the French and Indians, made claim to portions of the land, and at once a conflict arose between them and the new proprietors, the old asserting title under ancient deeds, and the new claiming under the establishment which they had received from Massachusetts. This conflict continued until some time in 1729, when the difficulties were adjusted, from which time the common lands were controlled and divided by the Falmouth proprietors, as they were called. These proprietors, at meetings called in accordance with statutes in force at this time, authorized the division of the common lands among such inhabitants as proved their right to proprietorship, and continued to lay out lots, until, well into the present century, when all records seem to have ended, although it is evident that some land remained undivided. The title to the land in dispute in this case originates under these old Falmouth grants, and for layings out and method of procedure, reference must be had to such of the old records of the town and proprietors as are now in existence and which have been offered in evidence, and to the copies from these records which make a part of the printed case. Soon after its organization,

the town laid out a highway running from King street (now India), up towards the head of Fore river, ending at the head of what was called the "Round Marsh," now commonly known as the Basin of the Oxford and Cumberland Canal. This Round Marsh adjoins one of the grants under which title is claimed in this suit. At the same time a highway was laid out "beginning at Fish street (now Exchange) and running along the river as the river runs three rods wide upon the bank or upland, until it meets with the way above said at the head of the Round Marsh." The marginal note of this record is, "Road by the water side." This is the road which is referred to in the grants of the thirty acre lots upon the northerly side of Fore river, and the records show that it was intended to run along the top of the bank which on this shore is very abrupt. The language of the various grants along this shore of Fore river indicates that this road or highway was excepted from the grants, and was treated as a boundary in laying out the grants, and it is quite certain that it was intended to be a boundary of one of the grants under which plaintiff claims title. It is not excepted from the other grant under which plaintiff claims title, the reason being that near this point it swung off to meet the road running from King street, to which reference has been made. The records of the town of Falmouth and of the proprietors of Falmouth show an intention to provide first for the necessities of the inhabitants and then to divide the more valuable portions of the common lands among them. After these more pressing needs were attended to, the town and proprietors began to divide the flats adjoining the upland, meanwhile retaining possession of all undivided marshes, and flats, and, through committees appointed for that purpose, cutting the grass, both salt and fresh, and distributing it among the inhabitants. In making these grants of flats, the town and proprietors did not in every instance convey to the parties to whom the former grants of the adjoining upland were made, although this was frequently done; the upland had changed hands in many instances, and in such cases the flats were often granted to the then owners of the upland. It is possible from these records to trace the larger part of the flats along the northerly shore of Fore river with reasonable accu-

racy, taking into consideration the fact that a portion of the records are missing, and that in many instances grants of flats were made bounding upon flats then owned by, or previously granted to, other owners whose grants cannot now be ascertained. The flats along the shores of Fore river were repeatedly granted as flats, sometimes for purposes of building wharves, at other times for no apparent reason other than to give the owner of the upland the right to the flats adjoining his upland. A large number of grants of flats (separate from upland) appear upon these records. The later records of the Falmouth proprietors show a number of votes appointing committees to ascertain what flats, etc., were left in the proprietors, and to provide a method of disposing of the same, either by public or private sale. The records further show that auction sales were held, at which all flats remaining in certain localities were sold for a nominal sum. To those who are familar with the early titles of Portland, it is well known that considerable confusion existed as a result of the conflict between the ancient and new proprietors of Falmouth ; that in many instances the disputed lines were never determined, and it can readily be seen that this uncertainty influenced the proprietors in making their grants, as in almost every instance the description ends with the words, "provided the same be free from former grants, etc."

Counsel contended : That the fact that following down the line of title to the land in controversy, no reference is made to flats for more than a hundred years, would not have been, had the owners of the upland considered themselves to be owners of the flats.

It is evident, upon examination of the old records, that it was not the intention in making grants of land to include flats.

The town and the proprietors treated the flats as reserved for common property when making grants of upland ; and from time to time conveyed them, without reference to the upland.

Plaintiff has no record title to the flats on Fore river in Portland.

The title to the property in question in this suit originated under two grants from the town of Falmouth ; one a thirty acre lot to Deborah Mills, dated January 18, 1721, described as follows :

"Granted to Deborah Mills the first thirty acre lot toward the round cove as it is now laid out, with a road to be allowed upon the bank front thirty rods and northeast by east into the woods eight score rod."

The other a thirteen acre lot to James Dueneven dated October 1st, 1729, described as follows :   "Beginning at a white oak stump adjoyning on James Mills thirty acre lot and thence by said lot northeast and be east til it meets with the head of Mr. Thomes' ten acre lot, and thence adjoyning to Thomes' lot til it comes to the cove or marsh, and thence round by the bank to the first bounds mentioned." The grants made by the town of Falmouth are public, and therefore the rule applies that the construction of these grants, if doubtful, must always be against the grantee and in favor of the grantor, the rule in such cases being contrary to that which applies where grants are made by private individuals.   Washburn on Real Property, 4th Ed. Vol. 3, 190 ; *Com.* v. *Roxbury,* 9 Gray, 490 ; *Martin* v. *Waddell,* 16 Peters, 411.

" Where an ancient location of grant by the proprietors of a township bounded the land granted by way, which way adjoined the sea shore, the Ordinance of 1641 did not pass the flats on the other side of the way to the grantee."   *Codman* v. *Winslow,* 10 Mass. 146.

While the Colonial Ordinance of 1641–7 has become by usage a part of the common law of Maine, its application is not to be extended so far as to create a grant where none was intended. *Storer* v. *Freeman,* 6 Mass. 435, 439, 4 Am. Dec. 155.

The James Dueneven grant contains the following : "Thence adjoyning to Thomes lot till it comes to the cove or marsh ; and thence round by the bank to the first bounds mentioned."

This description, under the decisions of this state, excludes the flats. *Nickerson* v. *Crawford,* 16 Maine, 245 ; *Bradford* v. *Cressey,* 45 Maine, 9 ; *Stone* v. *Augusta,* 46 Maine, 127 ; *Montgomery* v. *Reed,* 69 Maine, 510 ; *Brown* v. *Heard,* 85 Maine, 294 ; *Freeman* v. *Leighton,* 90 Maine, 541 ; *Rix* v. *Johnson,* 5 N. H. 520, 523, 22 Am. Dec. 472 ; *Daniels* v. *Cheshire R. R.,* 20 N. H. 85 ; *Dunlap* v. *Stetson,* 4 Mason, 349.

SITTING : WISWELL, C. J., EMERY, WHITEHOUSE, STROUT, SAVAGE, POWERS, JJ.

SAVAGE, J.   Writ of entry for the recovery of two parcels of the flats of Fore River in Portland, formerly Falmouth.   The plea is the general issue.   The question presented to us by the report is, which of the parties has the better record title.   If the tenant, then judgment is to be rendered for the tenant; if the demandant, then the case is to be remanded for trial upon the tenant's claim of title by adverse possession.

The decision of this question ultimately depends upon the construction to be given to two grants of land made by the town of Falmouth, one January 18, 1721, to Deborah Mills, and one, October 1, 1729, to James Dueneven.   The demandant claims that the demanded flats, being flats in Fore River, an arm of the sea, were included in the grants to Mills and Dueneven, by virtue of the colonial ordinance of 1641–7 ; and if that be so, it is not controverted that the record title to them has come down to the demandant.   On the other hand, if the flats were not included in the grants, the demandant has no title; and the tenant having shown a title under a warranty deed expressly conveying these flats, has a better record title and is entitled to judgment.

It appears that in 1718, under the authority of the Great and General Assembly of the Province of Massachusetts, the inhabitants of Falmouth organized a town government, and proceeded to lay out lots of land by a committee appointed for that purpose, and to distribute those lots.   Lots of various sizes were provided for, one acre lots, three acre lots, ten acre lots, thirty acre lots and so forth.   It also appears that ten or eleven thirty acre lots were laid out on Fore River, in the vicinity of the demanded premises, from northwest towards southeast, each thirty rods in width on the river, and were allotted or granted to various individuals in 1721.   The first of these in time as well as in order from the northwest was granted January 18, 1721, to Deborah Mills, in the following terms : "Granted to Deborah Mills the first thirty acre lot toward the Round Cove as it is now laid out, with a road to be allowed upon

the bank, front thirty rod, and northeast and by east into the woods eight score rod." On October 1, 1729, the inhabitants of Falmouth granted to James Dueneven a lot, with the following boundaries,— "Beginning at a white oak stump adjoining on James Mills thirty acre lot and thence" by sundry courses "till it comes to the Cove or Marsh and thence round by the bank to the first bounds mentioned." This grant represented a ten acre lot and a three acre lot. That the demanded flats lie to the seaward of the upland described in the foregoing grants, and within one hundred rods from high water mark, is not questioned.

The Massachusetts colonial ordinance of 1641–7, though enacted before Maine became a part of that province, has been adopted as a part of the common law of this state. *Burrows* v. *McDermott*, 73 Maine, 441. By this ordinance, "It is declared, that in all creeks, coves, and other places, about and upon salt water, where the sea ebbs and flows, the proprietor of the land adjoining shall have propriety to the low-water mark, where the sea doth not ebb above one hundred rods, and not more wheresoever it ebbs further." By force of this ordinance it is held that the owner of upland adjoining tidewater prima facie owns to low water mark; and does so, in fact, unless the presumption is rebutted by proof to the contrary. *Snow* v. *Mt. Desert Isl. R. R. Co.*, 84 Maine, 14, 30 Am. St. Rep. 331, 17 L. R. A. 280; *Doane* v. *Willcutt*, 5 Gray, 328, 335, 66 Am. Dec. 369. While a grantor may separate the flats from the upland, and convey the one and retain the other, *Storer* v. *Freeman*, 6 Mass. 435, 4 Am. Dec. 155, yet unless flats are excluded by the terms of the grant properly construed, they pass by a grant of the upland.

I. Now to apply these general rules to the grants in question, and of these, first to the Deborah Mills grant. It is suggested that there is nothing upon the face of the grant, nor in the other record proof to show that this particular lot was bounded at all by Fore River. But we think the contrary. The description in the grant itself is "as it is now laid out." But the evidence of how it was "laid out" is lacking. All the monuments are gone, and the records, if any, are probably lost. But we think it sufficiently appears from the records that this was one of a series of thirty acre

lots in this vicinity, on Fore River, all granted in 1721. All the other lots of this series, with one exception, were described as being on Fore River, and that one was granted "as now laid out." Besides, the descriptive language of the grant itself, "front thirty rods," is appropriate to land lying adjacent to the water, and is not appropriate to any other condition shown to have existed at the time of the grant. A lot of land may be said to "front" on water, but not usually to "front" on another piece of land. It may "front" on a road. But in this case there does not appear to have been any existing road. The language to the grant, "road to be allowed upon the bank," indicates rather the reservation of a public right of way for a road then contemplated, than for one then existing. But in whatever condition the road was, it is clear that it was not referred to as a boundary. The Mills lot evidently "fronted" on something, and we think that something was Fore River. It follows, therefore, by the usual rules of construction, that Deborah Mills, by the grant of this lot of upland fronting on tide-water, became also the owner of the adjacent flats to low water mark, not exceeding one hundred rods from high water mark. And her record title has come to the plaintiff.

But the tenant, at the trial, "claimed the right to submit to the inspection of the court the contents of certain early volumes of the records of Falmouth (town and proprietors) and to have the same examined by the court, and by the jury, if any questions of fact were involved, as tending to show historically and by reference to the terms of the original grants, by vote and by other proceedings of the town and the proprietors through the period of the records offered in this and similar instances, that such distribution of upland did not include any grant of flats." And by stipulation, the right claimed is to be accorded to the tenant at this stage of the case, or not, as this court may determine. The records offered are of two kinds, namely, those of the town of Falmouth from 1718 to 1729, and those of proprietors of Falmouth from 1730 to 1826. The claim of the tenant is that these records show that "the town and proprietors treated the flats reserved for common property," and that though "doubts may in some instances arise as to the precise construction of these

early grants, it is clear from the whole course of procedure that flats were generally separated from uplands in making these conveyances, and that flats were not conveyed or intended to be conveyed by grants of upland." And upon this counsel argue that the application of the colonial ordinance of 1641–7 is not to be extended, under such circumstances, so far as to create a grant of flats where none was intended.

Such records as these are undoubtedly admissible as evidence for the purpose of showing such historical facts as are disclosed therein. *Codman* v. *Winslow*, 10 Mass. 146; *Rust* v. *Boston Mill Corporation*, 6 Pick. 158; *Commonwealth* v. *Roxbury*, 9 Gray, 451; *Sumner* v. *Sebec*, 3 Maine, 223; *Goodwin* v. *Jack*, 62 Maine, 414. But to be entitled to consideration, the evidence must not only be admissible, but be relevant. And the question now presented is one of relevancy. We are now construing an ancient grant, a grant which by its terms makes no reference to flats. In construing this grant we are to give effect, if possible, to the intention of the parties, so far as it can be ascertained by legal rules of construction. Ordinarily the intent which is effective in a grant is the intent expressed by the language of the grant. It is the expressed rather than the unexpressed intent. It is ascertained by giving suitable effect to all of the words of the grant, reading them in the light of the circumstances attending the transaction, the situation of the parties, the state of the country, and of the estate granted, such as its condition and occupation. *Treat* v. *Strickland*, 23 Maine, 234; *Adams* v. *Frothingham*, 3 Mass. 352, 3 Am. Dec. 151; *Commonwealth* v. *Roxbury*, 9 Gray at p. 493. So far, therefore, as these ancient records tend to throw light upon the intent of the parties in any of the above mentioned particulars, they are clearly relevant to the issue. But we think the present proposition goes farther.

We have examined these records so far as our attention has been called to them by counsel. In general it may be stated, that they relate, except so far as they show these particular grants, to transactions with persons other than the owners of these lots, and to lots of land or flats, for the most part, neither contiguous to, nor, so far as we can discover, in any way connected with the lots in question.

The records of the proprietors of Falmouth are all of transactions subsequent to this grant, and are, of course, the records of another proprietary than the original grantor.

We think these records may fairly be regarded as showing, in addition to matter already stated, that in the years from 1721 to 1729 the town of Falmouth granted many other lots of different sizes, some of which were on Fore River, easterly of the lots in question; that the town by vote assumed to regulate the occupancy of the marshes, both salt and fresh, and apportion them to every man "according to his regular stock;" that at different times the town granted to individuals the privilege of building wharves against their own lands; that in very many instances, the town granted flats entirely separate from the upland, both to the owners of the upland and to others. In the majority of instances these grants of flats were "four rods" in width, and sometimes these were described as "across his acre lot." A few of the grants were wider, and one was "against his thirty acre lot." It also appears that controversies arose between parties holding under grants from the town, and other parties holding under grants from proprietors who owned or controlled the land before the organization of the town, the "ancient proprietors," so-called; that these difficulties were adjusted in 1729; and that from that time the common lands of Falmouth were controlled and divided by the "proprietors" instead of by the town. The proprietors' records from 1730 to 1826 show many instances of the grant of flats alone, some of the grant of upland and flats eo nomine, and in one case at least, a grant of land bounded by "the water or sea," followed a year later by a grant of flats adjacent, to the same grantee. Some of the grants of flats were by the acre. Some were with, and some without, reference to the ownership of the upland. These records also show proceedings from time to time for the distribution of "the remainder of the common lots," for ascertaining "what flats remained," and an attempt to sell the remaining flats at public auction.

Upon this showing, the learned counsel for the tenant argue that the very multitude of instances of separate grants of flats indicate a very general, if not practically universal practice of conveying

uplands and flats separately, that the methods pursued show clearly that it was the intention not to include flats in the grants of upland, unless expressly so stated, and that that intention so shown, may be read into this grant to Deborah Mills, which is otherwise silent, in terms, as to any such intention.

But it is necessary only to state this question, not to decide it. Assuming, but not by any means deciding, that the evidence is relevant and admissible for the purpose for which it is offered, we think it is insufficient to show any such general practice as is claimed, certainly not with respect to the flats in question, nor to those in the immediate vicinity. The flats along Fore River are not all of the same width, character or utility, and it might well be argued that because a practice was shown with regard to flats in one quarter, it would not follow that the same practice would be adopted for another quarter. Generally speaking, the size of the flats granted separately seems to indicate that they were adjacent to the small lots granted on Fore River, the one acre or three acre lots, and not to the thirty acre lots. No separate grant is shown of the flats in front of the Mills lot. Nor have we been able to discover, with possibly one exception, where the location is doubtful, the separate grant of any flats in front of any of the other ten thirty acre lots granted in this vicinity on Fore River in 1721. It is true that some of the records have become lost, and that it is now impossible to trace many titles accurately. At the same time, if any of the separate grants of flats did relate to flats in front of these ten lots, a distance of nearly a mile, it is singular that the diligence of counsel has been unable to discover a single case, with certainty.

The boundaries, on the water side of these ten lots, were generally in terms which by the usual rules of construction would include the flats, such as "thirty rods front on the river," "thirty rods up the river," "down the river," "down the river side," and so forth. This fact, with the other fact that there certainly was no attempt on the part of the town or proprietors to grant flats separately in front of the Deborah Mills lot, and apparently no attempt to grant separately any flats in front of the other ten thirty acre lots granted in 1721, rather tend, we think, to show that the town of Falmouth in 1721

did intend to grant flats with upland upon this portion of Fore River, whatever may have been its intention afterwards, and as to other portions of Fore River.

Another matter worthy of consideration is that a way was laid out along the "bank" of Fore River, in 1727, and the language of many of the grants indicates that this way was treated as a boundary in laying them out. If so, the flats in such cases did not pass by grant of the upland. And so far, this would furnish occasion for the subsequent grants of the adjacent flats.

The tenant, therefore, is not aided in showing intent by the evidence it seeks to introduce.

Accordingly, we hold that the plaintiff has the better record title to so much of the demanded premises as is included within the limits of the original grant to Deborah Mills, including flats.

II.   The remainder of the demanded premises was included in the flats adjacent to the lot granted to James Dueneven, October 1, 1729. We think the description in this grant did not include the adjacent flats. It is true that the description of the side line as extended "till it comes to the cove," standing alone, would carry the line to low water mark. *Babson* v. *Tainter*, 79 Maine, 368; Gould on Waters, § 195.   But it does not stand alone.   The line after it "comes to the cove" is then made to proceed *"round by the bank* to the first mentioned bounds."   The term "bank" is not strictly appropriate to arms of the sea, tidal waters, but is applicable to non-tidal fresh water rivers. The term "shore" is appropriate to the former, but not to the latter. *Morrison* v. *First Nat'l Bank*, 88 Maine, 155.   Whether the word "bank" in a grant like this is to be construed as the same word would be in the case of non-tidal waters may depend upon the context, the other calls in the grant, or the situation of the property. Here we think the analogy of fresh water streams should be followed.   The bank is not the shore.   The term shore technically means all the ground between ordinary high water mark and low water mark, that is, the flats.   "To the shore" is not *over* the shore. "To the shore" and thence "by the shore," unqualified, excludes flats.   *Storer* v. *Freeman*, 6 Mass. 435, 439, 4 Am. Dec. 155; *Montgomery* v. *Reed*, 69 Maine, 510.   But the expression may be

qualified by other phrases showing an intention to include the flats, as in *Snow* v. *Mt. Desert Island R. E. Co.,* 84 Maine, 14, 30 Am. St. Rep. 331, 17 L. R. A. 280, where the line "beginning at the sea," thence running around the parcel "to the shore, thence to the bounds first mentioned," was held to include the flats. But in the grant under consideration, the seaward line ran not by the "shore," but by the "bank." It appears in this case that there was at the shore end of the lots granted on Fore River a physical formation which was then known and called the "bank" of Fore River. It was somewhat abrupt and precipitous. It extended to the shore. The Cumberland and Oxford canal was afterwards built at the foot of it. The ancient grants show that a road was laid out on the "bank" of Fore River. This "bank" was therefore a monument. It was not the sea. It was not the shore. It was the land adjacent to the shore. The "bank" extended to the margin of the shore, as in case of a fresh water river the bank extends to the margin of the water. There was the definite line. Gould on Waters, § 41; *Stone* v. *Augusta,* 46 Maine, 127. The case of *Bradford* v. *Cressey,* 45 Maine, 9, although relating to non-tidal waters, is in point. The court there said: "If the grantor, however, after giving the line to the river, bounds his land by the bank of the river, or describes his line as running along the bank of the river, or bounds it upon the margin of the river, he shows that he does not consider the whole alveus of the stream a mere mathematical line, so as to carry his grant to the middle of the river." See *Hatch* v. *Dwight,* 17 Mass. 289, 9 Am. Dec. 145; *Commonwealth* v. *Roxbury,* 9 Gray, at p. 524.

This construction is aided also by the further consideration that the description of this lot begins at a white oak stump, manifestly a monument on the land at or above high water mark, and the last or seaward course runs "round by the bank *to the first bounds mentioned.*" We think the line was expressly limited to the "bank" and the end of it was fastened to the white oak stump. *Freeman* v. *Leighton,* 90 Maine, 541. We cannot change its position.

The grant to James Dueneven made the "bank," the land by the margin of the shore, the specific boundary on the seaward side, and, we think, excluded the flats, and no person holding under Dueneven

has ever had title to the flats by grant. So far as the question of record title is concerned, the tenant is in possession holding under a warranty deed expressly conveying the flats. But that is a better record title to the flats embraced in the Dueneven grant than anything shown by the demandant. *Blethen* v. *Dwinel,* 34 Maine, 133 ; *Rand* v. *Skillin,* 63 Maine, 103. The demandant will not be entitled to judgment for the flats adjacent to the Dueneven lot. But as to those in the Deborah Mills grant, the demandant has shown a better record title.

Therefore, in accordance with the stipulation of the parties, the case must be remanded to nisi prius, to be tried upon the tenant's claim of title to the flats on the Deborah Mills lot, by adverse possession.

*So remanded.*