EUGENE S. MARTIN

*vs.*

MAINE SAVINGS BANK ET AL.

Cumberland.   Opinion, November 21, 1958.

*Arthur A. Peabody,* for plaintiff.

*George A. Wathen,* for Maine Bldg. Industrial Authority.

*Verrill, Dana, Walker,*
*Philbrick & Whitehouse,* for Maine Savings Bank.

*Linnell, Perkins, Thompson & Hinckley,*
for Gorham Development Corp. and
Maine Metal Finishing Co.

SITTING: WILLIAMSON, C. J., WEBBER, TAPLEY, SULLIVAN, DUBORD, SIDDALL, JJ.

WILLIAMSON, C. J.  On report.  The parties to this bill in equity join in seeking a declaratory judgment involving the constitutionality of the Maine Industrial Building Authority Act (hereinafter called the Enabling Act), P. L.,

1957, c. 421, § 1; R. S., c. 38-B. Uniform Declaratory Judgments Act, R. S., c. 107, § 38 et seq. The bill is reported by agreement of the parties for decision on bill, answers by all defendants, and an agreed statement of facts. R. S., c. 107, § 24.

The plaintiff is a depositor and corporator of the defendant Maine Savings Bank. The defendants are: the Maine Savings Bank (hereinafter called the Bank); the trustees of the Bank; the Maine Industrial Building Authority created by the Enabling Act (hereinafter called M.I.B.A.); the Gorham Development Corporation (hereinafter called Gorham), a local development corporation and an eligible mortgagor within the meaning of the Enabling Act; the Maine Metal Finishing Company (hereinafter called Maine Metal), a Maine corporation with "one of its principal purposes the manufacturing, processing or assembling of raw materials or manufactured products" and which admittedly, to quote from the bill, "has immediate need to expand its manufacturing facilities and has agreed to lease or conditionally purchase from Gorham, an industrial project to be erected by Gorham to the specifications of Maine Metal," and the Attorney General.

The agreed statement of facts reads in part:

"1. That all the Parties hereto are proper Parties to this action and all of said Parties are properly designated in their respective capacities.

"2. That Maine Metal Finishing Company has executed an Agreement to lease a certain building to be constructed by and on the property of Gorham Development Corporation . . .

"3. That the estimated cost of the construction of the industrial building mentioned in Paragraph 2 will be approximately $50,000.

"4. That Gorham Development Corporation and the Maine Savings Bank, acting through its trus-

tees, have mutually agreed that, upon the completion of the said industrial building, Maine Savings Bank will loan to Gorham Development Corporation the sum of $45,000, and Gorham Development Corporation will secure said loan by a first mortgage on the said land and industrial building; provided the Maine Industrial Building Authority will issue a contract or Certificate of Insurance to insure the payment of said mortgage loan to the Maine Savings Bank.

"5. That the Maine Savings Bank, acting by and through its trustees, on August 5, 1958, approved a loan to Gorham Development Corporation of $45,000 on the terms and conditions above expressed but that none of said money has been paid over or delivered to said Gorham Development Corporation or to any other person, firm or corporation for the use of said Gorham Development Corporation.

"6. That the Defendant, Maine Industrial Building Authority, has entered into a commitment to insure said mortgage payment in the amount of $45,000 when said industrial project is completed, and when said loan has been made, and said first mortgage has been executed and delivered; . . ."

The decisive issue in the case appears in paragraph 13 of the bill, denied by the defendants, reading:

"13. That the commitment to insure or guarantee issued by the Maine Industrial Building Authority and the actual contract to insure or guarantee to be issued by said authority to the Maine Savings Bank is not valid and not binding on said Maine Industrial Building Authority and affords no security to the Maine Savings Bank as the Enabling Act is not in conformity with Section 14-A of Article IX of the Constitution of the State of Maine. . . . Said Section 14-A of Article IX provides:

'Section 14-A. For the purposes of fostering, encouraging and assisting the physical location,

settlement and resettlement of industrial and manufacturing enterprises within the State, the Legislature by proper enactment may insure the payment of mortgage loans on the real estate within the State of such industrial and manufacturing enterprises not exceeding in the aggregate $20,-000,000 in amount at any one time and may also appropriate moneys and authorize the issuance of bonds on behalf of the State at such times and in such amounts as it may determine to make payments insured as aforesaid.'

"The Enabling Act is in conflict with said Constitutional Amendment in that said Act provides that the mortgage on the industrial project may only be given by a local development corporation, while the Constitution provides that the mortgage must be on the real estate of an industrial or manufacturing enterprise, and thus such Enabling Act is void and of no force and effect."

Reference hereinafter to section 14 and section 14-A will mean to these sections in Article IX of the Constitution.

The plan adopted by the Legislature pursuant to section 14-A is simple and plain in outline. It is contained in two statutes passed at the special session of the 98th Legislature in October 1957; (1) the Enabling Act, enacted under the Emergency Clause and effective when approved on October 31, 1957, and (2) "An Act Relating to the Maine Industrial Building Authority" (P. L., 1957, c. 430) enacted without the Emergency Clause and effective January 30, 1958.

We summarize the Acts and set forth the portions in which we are particularly interested.

### The Enabling Act

"Sec. 1. Title. This chapter shall be known and may be cited as the 'Maine Industrial Building Authority Act.'

"Sec. 2. Purpose. It is declared that there is a state-wide need for new industrial buildings to

provide enlarged opportunities for gainful employment by the people of Maine and to thus insure the preservation and betterment of the economy of the State and its inhabitants. It is further declared that there is a need to stimulate a larger flow of private investment funds from banks, investment houses, insurance companies and other financial institutions including pension and retirement funds, to help satisfy the need for housing industrial expansion. Therefore, the Maine Industrial Building Authority is created to encourage the making of mortgage loans for the purpose of furthering industrial expansion in the State.

"**Sec. 3. Credit of State pledged.** The Maine Industrial Building Authority is authorized to insure the payment of mortgage loans, secured by industrial projects, and to this end the faith and credit of the State is hereby pledged, consistent with the terms and limitations of section 14-A of Article IX of the Constitution of the State of Maine.

"**Sec. 4. Organization of authority.** The Maine Industrial Building Authority hereinafter in this chapter called the authority, hereby created and established a body corporate and politic, is constituted a public instrumentality of the State, and the exercise by the authority of the powers conferred by the provisions of this chapter shall be deemed and held to be the performance of essential governmental functions. . . .

\* \* \* \* \* \* \* \*

There follow provisions for the membership and organization of the Authority with which we are not here concerned.

"**Sec. 5. Definitions.** As used in this chapter, the following words and terms shall have the following meanings unless the context shall indicate another or different meaning or intent:

\* \* \* \* \* \* \*

"**III.** 'Industrial project' shall mean any building or other real estate improvement and, if a part

thereof, the land upon which they may be located, and all real properties deemed necessary to their use by any industry for the manufacturing, processing or assembling of raw materials or manufactured products.

"IV. 'Local development corporation' shall mean any organization, incorporated under the provisions of chapter 54, sections 1 to 16, for the purposes of fostering, encouraging and assisting the physical location, settlement and resettlement of industrial and manufacturing enterprises within the State, and to whose members no profit shall enure.

\* \* \* \* \* \* \*

"VI. 'Mortgage' shall mean a mortgage on an industrial project and the term 'first mortgage' means such classes of first liens as are commonly given to secure advances on, or the unpaid purchase price of, real estate under the laws of the State of Maine, together with the credit instruments if any, secured thereby.

\* \* \* \* \* \* \*

"VIII. 'Mortgagor' shall mean the original borrower under a mortgage and his successors and assigns, and shall be limited to local development corporations.

\* \* \* \* \* \* \*

"Sec. 6. Powers of the Authority. . . . .

"Sec. 7. Local development corporations. When a local development corporation does not meet mortgage payments insured by the authority by reason of vacancy of its industrial project, the authority, for the purpose of maintaining income from industrial projects on which mortgage loans have been insured by the authority and for the purpose of safeguarding the mortgage insurance fund, may grant the local development corporation permission to lease or rent the property to a responsible tenant for a use other than that specified in section 5, subsection III, such

lease or rental to be temporary in nature and subject to such conditions as the authority may prescribe.

"Sec. 8.   Mortgage insurance fund.

\* \* \* \* \* \* \*

"Sec. 9.   Insurance of mortgages.   The authority is authorized upon application of the proposed mortgagee to insure mortgage payments required by a first mortgage on any industrial project, upon such terms and conditions as the authority may prescribe, provided the aggregate amount of principal obligations of all mortgages so insured outstanding at any one time shall not exceed $20,000,-000.   To be eligible for insurance under the provisions of this chapter a mortgage shall: . . .

\* \* \* \* \* \* \*

"Sec. 10.   Mortgage insurance premiums . . . Such premiums shall be payable by the mortgagees in such manner as shall be prescribed by the authority.

"Sec. 11.   Authority expenses. . .

"Sec. 12.   Mortgages eligible for investment. Mortgages insured by the authority of this chapter are made legal investments for all insurance companies, trust companies, banks, investment companies, savings banks, executors, trustees and other fiduciaries, pension or retirement funds.

"Sec. 13.   Records of account. . . .

"Sec. 14.   Authority to provide funds. . . . . The Governor and Council shall transfer (moneys to mortgage insurance fund) from the State contingent account or from the proceeds of bonds . . . The bonds so issued shall be deemed a pledge of the faith and credit of the State."

The Legislature in section 2 appropriated $500,000 for the establishment of the mortgage insurance fund.

"An Act Relating to the Maine Industrial Building Authority," P. L., 1957, c. 430, supplements the Enabling Act in matters of detail.

> "Sec. 1. Powers. The Maine Industrial Building Authority is authorized and empowered to enter into agreements with prospective mortgagees and mortgagors, for the purpose of planning, designing, constructing, acquiring, altering and financing industrial projects.

> "Sec. 2. Additional power. The Maine Industrial Building Authority is also authorized and empowered to acquire, hold and dispose of real and personal property and make and enter into all contracts, leases, agreements and arrangements necessary or incidental to the performance of its duties and the execution of its powers under the provisions of An Act to Create the Maine Industrial Building Authority, heretofore passed by this Legislature."

> Sections 3 and 4 relate to acquisition and disposal of property and the crediting of certain proceeds to the mortgage insurance fund.

> Sec. 5 provides that any limitations as to the holding of real and personal property shall not apply to "local development corporations."

The general plan established by the Legislature in the Enabling Act is not altered by chapter 430. Of interest is section 1 spelling out the power of M.I.B.A. to "enter into agreements with prospective mortgagees and mortgagors." In the case at bar the M.I.B.A. made a commitment to insure a mortgage to be given in the future on fulfillment of certain conditions. It is clear that chapter 430 has no life or purpose apart from the Enabling Act. For convenience we will hereafter, unless otherwise indicated, include chapter 430 within the meaning of the term "Enabling Act."

There is no suggestion in the case that the parties have failed, or will fail, to comply with the Enabling Act and the

requirements of M.I.B.A. If the statute is valid the plaintiff has no complaint. In short, the validity of the statute, not compliance with the statute, is in issue.

The decisive issue remains as stated in paragraph 13 of the bill. Does the provision in the Enabling Act (Sec. 5, VIII) that the mortgagor "shall be limited to local development corporations," conflict with the provision of section 14-A, that "the Legislature by proper enactment may insure the payment of mortgage loans on the real estate within the State of such industrial and manufacturing enterprises," thus rendering the Enabling Act void and of no effect? We think not.

There are certain principles to be kept in mind in considering the exact point in issue.

First: The long standing policy of the State in section 14, that "The credit of the state shall not be directly or indirectly loaned in any case" was altered by the addition of the words "except as provided in section 14-A" and by the adoption of the new section 14-A, *supra*. For the history of section 14, see *Opinion of the Justices,* 146 Me. 183, 186, 79 A. (2nd) 753. We have no concern with the wisdom of the change in policy. Our obligation and duty is to declare what the law is, and to apply the law in the case before us.

Second: On October 29, 1957, the six Justices of the Supreme Judicial Court (one of whom has since retired) gave their opinions pursuant to their obligation under Sec. 3 of Art. VI of the state constitution to the Senate to the effect that the present chapter 421, then Legislative Document 1614, if enacted, would be constitutional. In an advisory opinion which, although all joined therein, is, under our practice, the advisory opinion of each justice acting individually, the justices said, in part:

"... we are of the view that the means chosen are reasonably adapted to carry out the purposes of

Section 14-A of the Constitution and are otherwise constitutional."

*Opinion of the Justices,* 153 Me. 202, 215, 136 A. (2nd) 528.

It is familiar law that an advisory opinion binds neither the justice who gave the opinion nor the court when the same questions are raised in litigation. Justice Rufus Tapley, in *Opinion of the Justices,* 58 Me. at 615, stated the principle in apt language:

"We can only proceed in the investigation upon the views of the law appertaining to the question, as they appear to us upon first presentation, and anticipate as well as we can the ground which may be urged for or against the proposition presented, never regarding the opinions thus formed as conclusive, but open to review upon every proper occasion."

Our duty is to consider the problem anew in light of the issues presented and with the aid and assistance of the research, briefs, and arguments of counsel. The defendants urge that the rule of *Cummings* v. *Eastman,* 126 Me. 147, 151, 136 A. 810, involving the validity of the removal of a sheriff is applicable. The court said:

". . . public policy, at least, requires that strong and compelling reasons be presented before the Court sitting *en banc* will hold an act by the Chief Executive of this nature invalid when taken in pursuance of a construction of the organic law given upon request under the constitution by a majority of the Court."

In the instant case there has been no final action taken under the Enabling Act. At most, the Legislature passed the Act in reliance upon the Opinion of the Justices as to its constitutionality. We need not consider what, if any, application the *Cummings* case would have had action final in nature been taken. See also *Laughlin* v. *City of Portland,*

111 Me. 486, 90 A. 318; *Commonwealth* v. *Welosky,* 276 Mass. 398, 177 N. E. 656; *Bowe* v. *Secretary of the Commonwealth,* 320 Mass. 230, 69 N. E. (2nd) 115; *Lincoln* v. *Secretary of Commonwealth,* 326 Mass. 313, 93 N. E. (2nd) 744.

Third: We approach the issue of constitutionality of the Enabling Act, having in mind the principles well stated for the court by Chief Justice Fellows in these words:

> "In passing upon the constitutionality of any act of the Legislature the court assumes that the Legislature acted with knowledge of constitutional restrictions, and that the Legislature honestly believed that it was acting within its rights, duties and powers. All acts of the Legislature are presumed to be constitutional and this is 'a presumption of great strength.' *State v. Pooler,* 105 Me. 224, 228; *Laughlin v. City of Portland,* 111 Me. 486; *Village Corporation v. Libby,* 126 Me. 537, 549. The burden is upon him who claims that the act is unconstitutional to show its unconstitutionality. *Warren v. Norwood,* 138 Me. 180. Whether the enactment of the law is wise or not, and whether it is the best means to achieve the desired result are matters for the Legislature and not for the Court. *Kelley v. School District,* 134 Me. 414; *Hamilton v. District,* 120 Me. 15, 20." *Baxter v. Waterville Sewerage District,* 146 Me. 211, 214, 79 A. (2nd) 585.

In *First National Bank of Boston* v. *Maine Turnpike Authority, et al.,* 153 Me. 131, 171, 136 A. (2nd) 699, we recently said:

> "We are not unaware that all acts of the legislature are presumed to be constitutional and will not be adjudged to be otherwise unless the conclusion is free from all doubt."

The basic objective of section 14-A and the Enabling Act is to foster, encourage and assist the industrial expansion

of the state through the use of the state's credit to a limited extent in financing the cost of needed new industrial buildings for the use of the industrial and manufacturing enterprises (which we may for convenience call "industries") mentioned in the Constitution. Only a bare outline of the purposes is found in section 14-A. They are set forth in more detail in the Enabling Act.

There is no controversy between the parties arising from any supposed conflict between the purposes and provisions of the Enabling Act or the terms and conditions prescribed by the M.I.B.A. in administering the program on the one hand, and section 14-A of the Constitution on the other, except from the "ownership issue" to be later discussed.

Passing for a moment the "ownership issue" it satisfactorily appears that the "industrial project" of the Enabling Act (Sec. 5-III) comes within the meaning of real estate eligible for an insured mortgage under section 14-A. In short, there is no conflict between Act and Constitution about the kind or type of property to be covered by such a mortgage. For convenience therefore we shall refer to the "real estate" in section 14-A as an "industrial project" or "project."

It is not enough in our view of section 14-A simply that an industrial building be constructed that is suitable for or adapted to industrial purposes. Under both the Constitution and the Enabling Act it seems plain that the industrial building must be used by an industry, that is to say, an industrial or manufacturing enterprise. Only with such use does the building become an industrial project eligible for an insured mortgage.

Thus an industry of necessity gains an intimate connection with the project. Such interest therein is not of course necessarily measured by complete ownership. Further, it is implicit in section 14-A and in the Enabling Act that the

income to pay the mortgage must come from the industry using the project. There is no other source of revenue.

In brief, under any plan devised to carry out the purpose of section 14-A we will find an industry with an interest in the project equal at least to that of a tenant. There is no industrial expansion without industry, and industry must ultimately pay the cost of the new industrial buildings.

We see the plan in operation in the case at bar. "Maine Metal, has immediate need to expand its manufacturing facilities and has agreed to lease or conditionally purchase from Gorham, an industrial project to be erected by Gorham to the specifications of Maine Metal."

The agreement or commitment relating to insuring the Gorham mortgage on completion of the project and upon meeting conditions imposed by statute or prescribed by the M.I.B.A. call among other things for a lease from Gorham to Maine Metal at a rental sufficient to pay the mortgage in full over the term of the lease. The lease is to be assigned to the Bank as additional security for the mortgage. The lease will also provide in substance that on payment of the mortgage and fulfillment of the terms of the lease either that Gorham shall convey the project to Maine Metal or that Maine Metal shall have an option to purchase for $1. For purposes of the case it is immaterial which provision may be included in the proposed lease.

The Legislature in the Enabling Act has chosen to place the local development corporation between the industry on the one hand and the Bank or mortgagee on the other. The mortgage to be eligible for insurance may not exceed 90% of the cost of the project, with a ceiling of $1,000,000. In this manner the Legislature brings the locality directly benefited or developed by industrial expansion into the picture through the control to be exercised by the local development corporation "to whose members no profit shall

enure" and through the self-interest created by the necessity of raising 10% of the cost. The local development corporation, with its control of the project, seems also designed to lessen opportunity for speculation in industrial buildings or projects financed by insured mortgages. The wisdom of the policy is for the Legislature to determine and is not our concern. We may take note, however, that the means chosen are reasonably adapted to secure the desired end.

The decision hinges upon the meaning of the phrase in section 14-A, "real estate . . . of such industrial and manufacturing enterprises . . . ," and even more narrowly turns upon the meaning of the word "of."

The position of the plaintiff is that the project to be eligible for an insured mortgage must be owned by the industry. "Of" to the plaintiff means complete ownership, and since to give a first mortgage the local development corporation must have a good title, there is, says the plaintiff, a conflict between the Act and section 14-A.

We are convinced, however, that the People intended to give the Legislature broad powers to implement the policy permitted under section 14-A, and had no intention of limiting the means of carrying out the policy in the manner urged by the plaintiff. In reaching our decision we take the words creating the controversy in the context of the Constitution and we have in mind the purpose of section 14-A.

We are satisfied that something less than complete ownership by the industry meets the standard of section 14-A. In particular we are of the opinion that the proposed lease in the instant case to Maine Metal carries with it a sufficient part of the total rights comprising ownership to bring the Gorham mortgage within the bounds of eligibility for insurance.

The phrase "real estate . . . of such industrial and manufacturing enterprises" carries an element of use and possession, but it does not necessarily mean complete ownership, or, for example, title in fee simple. Such a construction it seems to us fairly and reasonably gives effect to the intention of the People and prevents suffocation of the objective of section 14-A under the cloak of a narrow construction.

See in Webster's New International Dictionary (2nd ed.) within the definition of "of" the following: "Indicating the possessive relationship, otherwise expressed by the possessive case; belonging or pertaining to, or connected with (a place, time, person, or thing) ; . . ."

There is not the slightest doubt that the Legislature intended section 14-A to cover the plan adopted in the Enabling Act. In submitting section 14-A to the People by "Resolve Proposing an Amendment to the Constitution Pledging Credit of State for Guaranteed Loans for Industrial Purposes" (Resolves 1957, c. 159, effective August 28, 1957), the Legislature had before it for consideration a bill "An Act to Create the Maine Industrial Building Authority," Legislative Document 640, which all agree was substantially like the Enabling Act, and in particular contained the provision limiting mortgagors to local development corporations.

In light of the necessity of a constitutional amendment to permit the desired policy, Legislative Document 640 was withdrawn. It reappeared in new form but with changes of no consequence for our purposes, as chapter 421 in the special session of the 98th Legislature held after the adoption of section 14-A. It may be said indeed that section 14-A was designed by the Legislature to meet the very plan subsequently enacted.

No complaint of unconstitutionality other than the "ownership issue" has been made by the plaintiff. Surely

we need not seek for issues not reached by the research and argument of counsel. Our decision is based on the issue presented and none other.

We point out that we do not pass upon the sufficiency of the various drafts of agreements and leases prepared for use by the M.I.B.A. and offered in evidence. They are instruments drawn to accomplish what we hold are proper and lawful objectives under a constitutional Act. We cannot be expected, nor indeed have we in argument been requested, to examine the drafts in detail.

The plaintiff fails in his attempt to enjoin the Bank and its Trustees from making the loan. The Enabling Act (P. L., 1957, c. 421) is constitutional, and so also is the supplementary act (P. L., 1957, c. 430). Acts and agreements of the M.I.B.A. pursuant to authority of the Enabling Act (as supplemented) are of full force and effect. The proposed loan by the Bank to Gorham if made pursuant to the authority of the Enabling Act (as supplemented) does not violate any provision of the banking laws.

The entry will be

*Case remanded for entry of a declaratory judgment decree in accordance with this opinion.*