Opinion, March 24, 1961.

OPINION OF JUSTICES

SITTING: WILLIAMSON, C. J., WEBBER, TAPLEY, SULLIVAN, DUBORD, SIDDALL, JJ.

OPINION

OF THE JUSTICES OF THE SUPREME JUDICIAL COURT
GIVEN UNDER THE PROVISIONS OF SECTION 3
OF ARTICLE VI OF THE CONSTITUTION

\* \* \* \* \* \*

QUESTIONS PROPOUNDED BY THE SENATE IN AN ORDER
DATED MARCH 7, 1961

ANSWERED MARCH 24, 1961

SENATE ORDER PROPOUNDING QUESTIONS

March 7, 1961

WHEREAS, a bill entitled "An Act Relating to Payment by Dealers to Producers for Milk Purchased" (Senate Paper 402, Legislative Document 1345), is pending before the Senate of the 100th Legislature and it is important that the Legislature be informed as to the constitutionality of the proposed bill; and

WHEREAS, it appears to members of the Senate of the 100th Legislature that certain provisions of this bill present important questions of law and the occasion is a solemn one;

THEREFORE, be it

ORDERED, that in accordance with the provisions of the Constitution of the State, the Justices of the Supreme Judicial Court are hereby respectfully requested to give this Legislature their opinion on the following questions:

1. Is this proposed legislation in conformity with Article I, Section 1, of the Constitution of the State of Maine as a valid exercise of the police power and the protection of the public welfare?

2. Is this proposed legislation valid under the 14th Amendment to the Constitution of the United States, or is it subject to the objection that it places upon a limited class of debtors an additional process to enforce payment of bills, to which process other classes of debtors are not subjected?

3. Is this proposed legislation valid under Article I, Section 11, of the Constitution of the State of Maine, and Article I, Section 10, of the Constitution of the United States of America, which sections prohibit the State from passing any law impairing the obligation of contracts?

A true copy attest:

CHESTER T. WINSLOW,
    Secretary of the Senate

Name: Parker

County: Piscataquis

In Senate Chamber
March 7, 1961
Read and Passed
CHESTER T. WINSLOW,
        Secretary

154

# ONE-HUNDREDTH LEGISLATURE

Legislative Document                                    No. 1345

S. P. 402                          In Senate, February 8, 1961
    Referred to Committee on Agriculture. Sent down for concurrence and ordered printed.
                    CHESTER T. WINSLOW, Secretary
    Presented by Senator Parker of Piscataquis.

## STATE OF MAINE

## IN THE YEAR OF OUR LORD NINETEEN HUNDRED SIXTY-ONE

## AN ACT Relating to Payment by Dealers to Producers for Milk Purchased.

Be it enacted by the People of the State of Maine,
    as follows:

R. S., c. 33, § 4-A, additional.   Chapter 33 of the Revised Statutes is amended by adding a new section 4-A, to read as follows:

'Sec. 4-A.  Semi-monthly payment by dealers to producers.  At least as often as semi-monthly, each dealer shall make payment to his producers of all sums due for products purchased or received during the preceding semi-monthly period.

Upon due notice and after hearing the Maine Milk Commission may suspend or revoke the license of a dealer who violates this section.'

### ANSWER OF THE JUSTICES

To the Honorable Senate of the State of Maine:

The undersigned Justices of the Supreme Judicial Court individually acknowledge receipt of your communication of

March 7, 1961, requesting our advice concerning the constitutionality of a bill entitled "An Act Relating to Payment by Dealers to Producers for Milk Purchased" (Senate Paper 402, Legislative Document 1345).

In considering the questions submitted, we are faced with the fact that on two occasions our Court has held statutes of like purpose with L. D. 1345 unconstitutional.

In *State* v. *Latham*, 115 Me. 176, the Court in 1916 held a 1915 Act unconstitutional in violation of the equal protection clause of the Fourteenth Amendment of the Constitution of the United States. The statute read as follows:

> "Every person, firm or corporation purchasing cream or milk for the purposes of reselling or manufacturing the same into other products, shall pay the producer, unless otherwise provided for by written contract, semi-monthly; payment to be made on the first day of each and every month for all cream or milk received prior to the fifteenth day of the preceding month, and payment to be made on the fifteenth day of each and every month for all cream or milk prior to the first day of the same month."

The Court said, at p. 177:

> "The statute in question when analyzed appears to be designed to compel purchasers of a particular product, intended for a particular use, to pay their purchase debts at particular times on pain of criminal prosecution, punishment by fine, and, of course, imprisonment for thirty days, if the fine is not paid. R. S. ch. 136, sect. 12. Whether such a statute, designed to aid in the collection of mere civil obligations by the use of the strong arm of the criminal law is within the proper exercise of the police power is at least questionable. Certainly it is not unless the regulation intended be for the promotion of the public health, safety, morals, comfort or welfare."

and again at p. 179:

> "It is class legislation. Its discriminations are not based upon any real differences in situation or condition. We feel compelled to hold that it conflicts with fundamental laws and is, therefore, of no effect."

In *State* v. *Old Tavern Farm, Inc.*, 133 Me. 468 (1935), the Court, with two justices dissenting, declared unconstitutional a 1933 Act requiring that the proprietor of a milk gathering station give a bond, or deposit money or securities, to secure payment to producers, as a condition precedent to obtaining a license. The Court held the Act violated both the Fourteenth Amendment of the United States Constitution and Art. I, Sec. 1 of the Maine Constitution. The opinion of the Court reads, at p. 471:

> "The Constitution of the State of Maine affirmatively secures to all persons an equality of right to pursue any lawful occupation under equal regulation and protection by law. Its words are these:
>
>> " 'All men are born equally free and independent, and have certain natural, inherent and unalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing and protecting property, and of pursuing and obtaining safety and happiness.' *Const. of Maine*, Art. I, Sec. 1.
>
> "Pertinent provisions of the Fourteenth Amendment to the Constitution of the United States are:
>
>> " ' . . . nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.' "

at p. 476:

> " 'The Latham Case is of controlling analogy.' "

In *State* v. *Latham, supra,* we have payment to producers required under criminal penalties. In *State* v. *Old Tavern*

*Farm, Inc., supra,* we have a bond or other security as a condition of obtaining a license. In L. D. 1345 we have a proposal of payment required under penalty of loss of license under the Milk Control Act (R. S., c. 33). The three proposals are alike in substance.

We are cognizant of the following facts:

(1)  that the Old Tavern Farm case arose under a statute enacted in 1933, and was decided in July 1935, only a few months after the original enactment under the Emergency Clause of the Act creating a Milk Control Board (Laws 1935, c. 13) ;

(2)  that the decision in the Old Tavern Farm case was in accord with the minority view of the decided cases in the nation; or stated differently, that the two justices in dissent adopted the majority view;

(3)  that the requirement of a bond to secure payments by dealers to producers (using the terms in a general sense, and not with the definitions of the Milk Control Act specifically in mind) has been apparently upheld in connection with Milk Control Acts (*Nebbia* v. *New York,* 291 U. S. 502), and

(4)  that neighboring states provide by statute for bonds designed to secure payments to producers of milk New Hampshire (R. S. annotated, c. 185: 4 through 10; Vermont statutes annotated, T. 6, §§ 1965, 1966, and 1968; Massachusetts General Laws annotated, c. 94, § 42 B).

In light of the earlier cases, the questions submitted in substance come to this: In the opinion of the justices would the Supreme Judicial Court sitting as the Law Court overrule its decisions of 1916 and 1935 in the *Latham* and *Old Tavern Farm* cases?

It becomes, therefore, of the highest importance that we determine precisely our duty as individual justices in acting upon the questions presented.

"They (the Justices of the Supreme Judicial Court) shall be obliged to give their opinion upon important questions of law, and upon solemn occasions, when required by the governor, council, senate or house of representatives."

Maine Constitution, Art. VI, Sec. 3.

The opinion given is the opinion of each justice as an individual. It is not the opinion of the *Supreme Judicial Court*. The fact that justices often, and perhaps usually, join in one opinion does not alter the fact that the opinion is not that of the Court, but of each justice. To illustrate, the Court decided the *Old Tavern Farm* case by a vote of 4 to 2. The dissenting justices stated their reasons for the record. The vitality of the case comes from the action of the majority who decided the issue.

In an advisory opinion there is no decision; there is no binding precedent. We said in *Martin* v. *Maine Savings Bank,* 154 Me. 259, at 269:

"It is familiar law that an advisory opinion binds neither the justice who gave the opinion nor the court when the same questions are raised in litigation. Justice Rufus Tapley, in *Opinion of the Justices,* 58 Me. at 615, stated the principle in apt language:

" 'We can only proceed in the investigation upon the views of the law appertaining to the question, as they appear to us upon first presentation, and anticipate as well as we can the ground which may be urged for or against the proposition presented, never regarding the opinions thus formed as conclusive, but open to review upon every proper occasion.'

"Our duty is to consider the problem anew in light of the issues presented and with the aid and assistance of the research, briefs, and arguments of counsel."

In the questions before us we have the converse of the *Martin* or *Industrial Building Authority Act* case. There an advisory opinion was followed by a litigated case. Here we have like statutes declared unconstitutional in two fully litigated cases followed by the request for an advisory opinion.

Each justice in giving his advisory opinion must necessarily be bound by the existing law under the decided cases of the Court. He cannot, any more than if he were sitting as a single justice to hear and decide a case, or were a judge of any other court, or a member of any other tribunal, do other than accept the decision of the Supreme Judicial Court sitting as the Law Court, except, of course, insofar as the laws of the United States or the decisions of the Supreme Court of the United States might control. When, as here, the issue has been clearly determined, he should not indicate what his views may be, or, indeed whether he has views, upon the existing validity of the settled law.

The occasion to reconsider the issue, with all the relevant facts arising both in the legislative process and in the development and presentation of the particular case, and with the benefit of briefs, research, and arguments, will come in litigation between party and party. "The impact of actuality and the intensities of immediacy are wanting," to quote from Justice (then Professor) Felix Frankfurter. 37 Harvard Law Rev. 1002, 1006. At best, in an advisory opinion we consider the legislative proposal. The *tug of litigation*, it seems to us, is of prime importance in the situation here presented. It was in litigation that our predecessors as a Court forty-five years ago, and again twenty-six years ago, made the decisions. It is this process which we consider here appropriate.

This is not the occasion to write at length on the advantages and disadvantages of advisory opinions. It is sufficient to note that however useful such opinions may be as

160

a guide in proposed actions, they do not replace, and are not designed to replace, or to be a substitute for, decisions made in course of litigation.

The Justices of the Massachusetts Court said, in an analogous situation, in 115 N. E. 978, at 979 (1917) :

> "It is established also that in answering questions submitted to them under chapter III, article II, of the Constitution, the Justices of this court are bound by the decisions of the court upon matters respecting which that court is the final authority. It is not open to the Justices in answering questions submitted to them under the Constitution to attempt to overrule a decision made by the court in a cause between party and party or to speculate upon the correctness of such a decision. If such a decision is to be overruled, it can be only after argument in another cause between party and party, where the rights of all can be fully guarded. It cannot be overturned by an advisory opinion of the Justices given without the benefit of argument. Without intimating that there is ground to question our decisions, it is enough to say that we are bound by them.

> "We construe all of the questions as applying to the two bills presented therewith and answer them all in the negative."

In Colorado, we read:

> "It is well understood that during the last ten years this Court has rendered several decisions denying the power. . . That there are decisions by the courts of other states in opposition as well as in support of the doctrine thus announced must be admitted. But we are decidedly of the opinion that the decisions of this court, deliberately announced in actual litigated cases, ought not to be overruled upon ex parte arguments in response to legislative questions."
>
> * * * * * * * * * *
>
> "Without intimating in any manner what conclusion might be reached in case the questions now

presented should be brought before the court in the regular course of litigation, we do not deem it proper to express any further opinion at this time." 15 Colorado 598 (1890), *In re House Resolutions Concerning Street Improvements.*

We are aware that the *Latham* and *Old Tavern Farm* cases do not touch the third question relating to impairment of contracts. It would seem useless, however, to give our opinion on this question in light of our expressed views on the first and second questions. If the Act becomes law, and if a case comes before the Court, not before us as individual justices, then will be the occasion to determine the constitutional issues in the case.

In responding in this manner, we fully realize that the importance of the questions of law is not lessened by the decisions of the Court rendered in 1916 and 1935.

The question here is whether the justices in their advisory opinion will overrule the earlier decisions of the Court. It is this question which, on mature reflection, we deem should not be answered, but should be left to litigation.

Dated at Augusta, Maine, this 27th day of March, 1961.

Respectfully submitted:

ROBERT B. WILLIAMSON
DONALD W. WEBBER
WALTER M. TAPLEY, JR.
FRANCIS W. SULLIVAN
F. HAROLD DUBORD
CECIL J. SIDDALL