Knox & al. v. Pickering.

## KNOX & al. vs. PICKERING.

The grant of four townships of land in 1799 by the Commonwealth of Massachusetts to *Henry Knox*, containing an exception of the lots occupied by settlers, not exceeding one hundred acres to each, certain lots were afterwards laid out to settlers, fronting on the *Penobscot* river, and bounded by monuments erected on the bank, being the lots in their actual occupancy prior to the grant. It was held that the flats fronting these lots were within the fair construction of the exception, and belonged to the settlers as riparian proprietors.

IN this action, which was a writ of right, the demandants, counting on the seisin of their ancestor the late Gen. *Knox*, asserted their title to a parcel of flats in *Bangor*, lying in front of the settler's lot No. 10, originally granted to the heirs of *James Dunning*.

The demandants adduced in evidence the Resolves of *Feb.* 17th and 23d 1798, the purport of which is stated by the Chief Justice in the opinion of the court. They also read a deed from *Thomas Davis*, agent for the Commonwealth, to Gen. *Knox*, dated *July* 20, 1799, made pursuant to those Resolves; conveying to him certain townships of land, including *Bangor*, excepting the lots occupied by settlers, not exceeding one hundred acres to each. Gen. *Knox* died disseised in the year 1806.

The tenant gave in evidence the Resolve of *March* 5, 1801, providing for the survey and location of certain lots to settlers in *Bangor*, not exceeding one hundred acres to each; and a deed from the Commonwealth's agents *Reed* and *Coffin*, dated *Nov.* 11, 1802, pursuant to the Resolve, conveying to the heirs of *James Dunning* an original settler, a lot of land in *Bangor*, bounded "beginning at a stake and stones, the corner of lot No. 10, thence north 45 degrees west 292 poles to a stake marked; thence west 45 degrees south 51 rods; thence south 45 degrees east to the bank of the river to the corner of lot No. 9; thence upon the bank of said river to the first mentioned bounds." He also produced a deed from *James Dunning*, dated *June* 1, 1800, conveying five eighths of his lot No. 10, to *James Thomas* and *Jeremiah Dudley*; and deduced

title to the premises under this deed and divers other mesne conveyances, from *Dunning's* heirs, down to himself.

It appeared that in the year 1800 *Dudley* took possession of the lot No. 10; and that in the following year he built a wharf on part of the demanded premises, of about thirty feet in width, and extending from near the bank as it then stood, quite to the thread of the first channel, but not the main channel, of the river; on which he erected a store in 1801 or 1802. It was also proved, by the testimony of *Park Holland*, the original surveyor for the Commonwealth, that when he made the survey in 1801, *Dudley* and one *Hatch* were both in possession of lot No. 10, claiming the flats as well as the upland; that for a monument at the north corner of that lot he placed a stake and stones about ten feet below high water mark; and should have placed it lower but for the apprehension that it would be carried away by the ice; that the monument at the south corner was a large pine tree standing on the bank, at high water mark; and that in all his survey of the settlers' lots he placed his monuments on the bank and not in the stream, for fear of having them destroyed by the ice. It was also proved that the water of the river was fresh, though the tide ordinarily ebbs and flows against the premises about fourteen feet. The tenant's store stands below the former bank of the river.

Upon this evidence, and some other offered by the demandant, but not affecting the question decided, a verdict was taken for the demandants, by direction of *Parris J.* who sat in the trial; subject to the opinion of the court upon the right of the demandants to maintain this action; and to be amended accordingly.

*R. Williams* and *Allen* argued for the demandants; contending that the whole township was granted to *Knox* in 1799, except one hundred acres to each settler. Nothing passed to settlers by the Resolve of 1798, as it contained no words of grant. Every thing relating to them was prospective. They were to be quieted in one hundred acres each, and no more; and to this exact quantity the Commonwealth's right to quiet them, under the reservation in *Knox's* deed, must be strictly limited. *Shep. Touchst.* 78; *Co. Litt.* 106, b. And the location, when once rightly made, is conclusive. *Lam-*

bert v. Carr, 9 Mass. 185; Harlow v. French, ib. 192.   Here
was an actual location, of the full quantity of one hundred acres, on
the upland alone ; and of course the title of Knox to the flats re-
mained unto... . .   Nor could the flats p. ... as appurtenant to the
upland by the ... ...: of K... , ...cause they were already sep-
arated from the upland, by the ...   Hutch m. Dwight, 17 Mass.
289 ; Lunt v. Holland, 14 Mass. 151 ; Morrison v. Keen, 3
Greenl. 474.

But if the Commonwealth owned the whole, yet the flats did not
pass to Dunning, being excluded by the necessary construction of
his deed, which confines him to the monuments erected on the bank
of the river.    Shep. Touchst. 87, rule 4 ; Doane v. Broad Street
Association, 6 Mass. 332 ; Storer v. Freeman, ib. 434 ; Codman
v. Winslow, 10 Mass. 146 ; Dunlap v. Stetson, 4 Mason 349, 365 ;
Handley v. Anthony, 5 Wheat. 374 ; 2 Dane's Abr. 691, 701 ; Sul-
livan on Land-titles, 285.

Godfrey, for the tenant, cited Storer v. Freeman, 6 Mass. 134 ;
Commonwealth v. Charlestown, 1 Pick. 180 ; Ingraham v. Wil-
kinson, 4 Pick. 268 ; 3 Dane's Abr. 136.

The opinion of the Court was delivered in Cumberland, at the
adjournment of May term, in August following, by

MELLEN C. J.   The Resolve of February 17, 1798, was passed
on the petition of Henry Knox, late father of the demandants, and
largely interested in the Waldo claim at the time.   The Resolve of
February 23d of the same year relates to the same subject, and makes
further arrangements for the completion of the objects contemplated
in the former one.   From both of them, viewed in connexion, the
following facts appear, viz :—That in the year 1692 a large tract of
land was granted to Beauchamp and Leveret, which in the year
1785 was confirmed by the legislature of Massachusetts to the heirs
of Brigadier General Waldo, and others interested therein, agreea-
bly to certain boundaries recommended by the committee for the
sale of eastern lands ; and that in the survey and location of said
tract, the same was found to run into the Plymouth patent, which

was holden under a prior grant; and on the representation of said heirs and others interested, in consequence of such interference, a committee was appointed to investigate the subject. That when their report was made, on their recommendation, *Thomas Davis*, Esquire, was appointed and commissioned with full power to cause a re-survey of the *Waldo* patent to be made; to ascertain the amount of deficiency occasioned by the interference above mentioned with the lands of the *Plymouth* company, and cause to be laid out and assigned, to said heirs and others interested, so much land, belonging to the Commonwealth, as would be equal to the amount of such deficiency, and extend the addition to be made to the *Waldo* patent, the whole length of the northern line of it, as far as the lands of the Commonwealth adjoined thereto. And that " the lots, not exceeding one hundred acres to each settler, which should be occupied by any settlers on the additional lands to be assigned, should not be considered as taken to make up said deficiency"—but that such settlers should be " quieted afterwards in their settlements in such manner as the General Court should direct." All these proceedings were had prior to the conveyance of *Davis* to *Henry Knox*; and the resolves were introduced by the demandant. We have been thus particular in stating these transactions, because, as they were originated on the petition of *Henry Knox*, he must be considered as cozusant of them, and, in some measure, as a party to them, as well as deeply interested; for we find the deed from *Davis* was made to him alone; and his heirs are the demandants.

It appears in the case that *James Dunning* was a settler on lot No. 10, in *Bangor*, prior to the year 1784; and that the deed was made to his heirs in *November* 1802, by the agents for the Commonwealth, in consequence of such settlement, and pursuant to resolves of the legislature. There were also many others in different parts of the town, in possession of lots abutting on the river, prior to 1784. The Commonwealth, as successor of the crown, became proprietor of all the public lands within its limits; and as to those in *Bangor*, continued so to be, until the 20th of *July* 1799, when the deed was made by *Davis* in behalf of the Commonwealth to *Knox*; and in virtue of the colonial ordinance of 1641, and of the usage and prin-

ciples founded thereon, the flats in *Penobscot* river and the *Kendus-keag* stream, in and near the land in question, were also the property of *Massachusetts*. There is no proof or pretence that there was ever any discrimination between the upland and flats made by the occupants of these shore or river lots, or any severance of the one from the other contemplated, until two years after the conveyance by *Davis* to *Knox*, even if there was then, at the time of *Holland's* survey and location of the settler's lots. We do not mean to intimate that any such severance was made by the deed of the agents of the Commonwealth to the heirs of *Dunning ;* nor is it a question, the decision of which we deem necessary on this occasion. But in addition to this negative proof, it appears that in 1800, *Dudley*, claiming under *James Dunning*, one of the heirs of the original settler, took possession of lot No. 10 ; and the next year built a wharf on a part of the premises demanded, extending to the first channel ; and soon after erected a store on it ; and that all the flats were claimed, as well as the upland. With these facts before us, which must be presumed to have been known to *Davis* and *Knox* at the time the deed was made, by reason of their agency and interest in the anterior proceedings relating to these lands, we are now to examine and ascertain the true construction to be given to the exception contained in that deed. After a general description of the lands intended to be conveyed, is the following expression ; " excepting certain lots occupied by settlers, not exceeding one hundred acres to each." *Knox* by accepting this deed, admits that settlers were then occupying certain lots on the land conveyed. Their possessions are called " lots ;" yet this deed was made about two years before *Holland's* survey ; of course it could have no reference to that. We must give a reasonable construction to the language of the exception, and ascertain as nearly as we can, what was the understanding and intention of both parties. It is a matter of notoriety that the settlers on the lands of the Commonwealth have always been treated with indulgence ; and under numerous resolves, applicable to different parts of the country, have been quieted in their possessions, on payment of a small sum, perhaps not more than the amount of the expenses of survey and location. The usage was to quiet each settler in one

Knox & al. *v.* Pickering.

hundred acres, so laid out to him as to include his improvements. The intention of the legislature, as expressed in the resolve of *February* 23, 1798, was that this liberal and indulgent treatment should be extended to the settlers on the four townships conveyed by the deed in question; hence the limitation as to the quantity of land, which forms a part of the exception. The whole course of proceeding on the part of the government, proves that these settlers were considered as the equitable owners of the lots or lands cultivated and possessed by them, and that they were to become the legal owners in the usual manner. For this reason, the agent of the Commonwealth, by the insertion of the exception, intended to leave the lands occupied by the settlers, under the complete control of the legislature, in the same way, as though the conveyance to *Knox* had never been made, and to be disposed of in the manner mentioned in the resolve of 1798. *Knox* had no concern with the terms and conditions on which the legislature might choose to quiet the settlers within the limits of the tract conveyed; being excepted in the deed in the language before mentioned, every thing composing a settler's lot, both upland and flats were excepted. Nor can we believe that the legislature, while thus liberal and indulgent to settlers, as the resolves prove them to have been, could have intended they should be excluded from the benefit of the waters and shores of the river and the accommodations they afforded, and thus deprived of those peculiar privileges which constituted a principal inducement for settling on lots adjacent to the river; nor would it have been very consistent with that liberal spirit which we have alluded to, for the legislature to have contemplated that the little strip of flats adjoining the upland of each settler should have been included as a component part of the one hundred acres designed for him. Such a construction would involve a singular confusion and contradiction of motives, unworthy of the legislature of *Massachusetts.* Surely, neither the heirs or assignees of *Henry Knox* have any reason to complain. The deed conveyed to him a tract of land sufficient to make up all the deficiency in the ancient grant, occasioned by the interference with the lands of the Plymouth Company. In addition to all the foregoing facts and circumstances, there is anoth-

er deserving of distinct consideration, as confirming our construction, and showing the understanding of all concerned at the time of the transactions we have been considering. The claim now made by the heirs or assigns of *Knox*, has for almost thirty years, to all appearance, been deemed by those interested to assert it, as one destitute of all legal foundation. During this long period all has remained in profound silence and repose. The claim has not been awakened from its slumbers by any newly discovered facts, the absence of which could account for such perfect acquiescence, in the measures adopted in the Commonwealth of Massachusetts, and carried into effect by different agents employed under its authority, in accordance with the evident intentions of all concerned.

In the view we have thus taken of this cause, inasmuch as not only the upland, but the flats adjoining the *Dunning* lot, were embraced in and by the language of the exception in the deed in question, it becomes an immaterial inquiry what *is* the true construction of the language of the agents' deed to *Dunning's* heirs. The flats demanded in this action never having been conveyed to *Henry Knox* by *Davis's* deed of 1799, there is no proof whatever of the seisin of *Henry Knox*, on which the demandants have counted : of course the action is not maintained. In this result there appears to be a perfect coincidence of the law and justice of the case.

The verdict must be set aside ; or rather, so amended as to stand a verdict for the tenant.