## Benjamin Barker *versus* Simeon Bates *et al.*

The rule of the Massachusetts colony ordinance of 1641, declaring that in all places upon salt water where the sea ebbs and flows, the proprietor of the land adjoining shall own the shore to low-water mark, or to the distance of one hundred rods if the sea ebbs further than one hundred rods, though never extended to the colony of Plymouth as a positive law, is nevertheless a settled rule of property in every part of the State of Massachusetts.

The owner of seashore has a title to and possession of wreck thrown upon his shore, and never reclaimed by the original proprietor, in preference to a mere stranger, and may maintain trespass against a stranger for entering upon his shore and taking away the wreck.

In such action the owner of the shore is entitled to recover as damages, the value of the property taken away.

TRESPASS. The plaintiff declared in his first count, that the defendants broke and entered his close, and that being so entered, they took and carried away a stick of timber there found. The second count was for taking and carrying away the stick of timber.

Barker
*v.*
Bates.

At the trial, before *Shaw* C. J., it appeared that the plaintiff was the owner of a farm in the town of Scituate, within the limits of the old colony of Plymouth, bounded easterly by the sea, which farm included two pieces of land conveyed to the United States as hereafter mentioned, and that, at the time of the commission of the supposed trespass, he remained the owner of all of the farm, excepting the parts so conveyed.

In 1811 an act was passed by the legislature of Massachusetts, (*St.* 1810, *c.*54,) providing that the United States might purchase or take any tracts of land, not exceeding six acres, which should be necessary for the lighthouse authorized to be erected at the entrance of the harbor of Scituate, reserving to this commonwealth exclusive jurisdiction over the land, except so far as might be necessary to enable the United States to carry their object into effect.

In pursuance of this act certain commissioners appraised and set off to the United States the two parcels of land above mentioned. The boundaries of the first parcel were described as beginning at a stake and stones and, after various courses, running northeasterly "to the cliff, thence by the cliff to the first mentioned stake and stones." Below the cliff was a beach. A plan of the farm and of the two parcels set off to the United States, was used in the case.

It appeared that the stick of timber in question was discovered by the defendants on the rocks, at low-water mark, below the easterly side of the parcel of land above described, that it was then marked by one of the defendants with his name, and that the defendants subsequently attempted to carry away the stick from this place, but were prevented by the roughness of the sea. The stick was afterwards thrown upon the beach below and adjoining the plaintiff's land, and on the easterly side thereof, and the defendants took and carried it away from the place last mentioned and converted it to their own use.

If upon the facts in the case the Court should be of opinion that the plaintiff was entitled to recover, the defendants were to be defaulted, and judgment to be rendered against them for the sum of 15 dollars damages ; otherwise a new trial was to be granted.

*Oct.* 28th,
1831.

*W. Baylies* and *Warren*, for the defendants, intimated that the plaintiff's land extended only to high-water mark, according

to the law of England; that the Massachusetts ordinance of 1641, declaring that in places upon salt water where the sea ebbs and flows, the proprietor of the land adjoining shall have propriety to the low-water mark, where the sea does not ebb above a hundred rods &c., did not become the law of Plymouth colony, when the two colonies were united.

But they contended, that if the plaintiff originally owned the shore where the timber was found, it passed with the land set off to the United States. *Doane* v. *Broad-Street Association*, 6 Mass. R. 332; *Adams* v. *Frothingham*, 3 Mass. R. 352.

But admitting that the shore was not conveyed to the United States, the plaintiff had but a qualified right in it. Every citizen has a right to go along the shore between high and low water mark. *Bagott* v. *Orr*, 2 Bos. & Pul. 472. The defendants therefore committed no trespass upon the plaintiff's soil, and the timber, being derelict, belonged to the first finder. Sea weed cast on shore belongs to the owner of the soil, being in the nature of alluvion or gradual increment; but it is not so with wreck or lost goods. If this timber was wreck, it belonged to the sovereign. *Emans* v. *Turnbull*, 2 Johns. R. 313; 2 Bl. Com. 14; 3 Dane's Abr. 137; 2 Kent's Com. 290; 1 Bl. Com. 295; *Constable's case*, 5 Co. 106 *a*; Amer. Jurist, *No.* 3, *p.* 119; *St.* 1814, *c.* 170.

*Eddy* and *Beal*, for the plaintiff, cited *Storer* v. *Freeman*, 6 Mass. R. 435; *Emans* v. *Turnbull*, 2 Johns. R. 313, 319; *Ball* v. *Herbert*, 3 T. R. 253.

SHAW C. J. delivered the opinion of the Court. The sole and single question in the present case is, which of these parties has the preferable claim, by mere naked possession, without other title, to a stick of timber, driven ashore under such circumstances as lead to a belief that it was thrown overboard or washed out of some vessel in distress, and never reclaimed by the owner. It does not involve any question of the right of the original owner to regain his property, in the timber, with or without salvage, or the right of the sovereign to claim title to property as wreck, or of the power and jurisdiction of the governments, either of the commonwealth or of the United States, to pass such laws and adopt such regulations on the subject of wreck, as justice and public policy may require.

22 *

Barker
*v.*
Bates.

*Oct. 26th.*

In considering this question of the relative right of possession, a preliminary one has been discussed, which is, whether the plaintiff had title to the land upon which the stick of timber was found. This place appears to have been on the sea-shore, between high and low water mark, in the town of Scitu-ate, a town within the limits of the old colony of Plymouth. A question was rather suggested than distinctly argued by the counsel, whether the right of proprietors of land bounding upon the sea or salt water, in that part of the commonwealth, have propriety to low-water mark. This suggestion is founded upon the consideration, that by the common law of England, the right of soil in the shores of the sea is in the sovereign, and as the colony of Plymouth was not within the limits or jurisdiction of Massachusetts, when the colony ordinance of 1641 was adopted by Massachusetts, the rule of the common law must prevail.

It is true, that in terms, the colony ordinance of Massachu-setts, adopted, confirmed and continued in force, by an express provision of one of the earliest acts of the provincial govern-ment, after the union of the three colonies of Massachusetts, Plymouth and Maine, by the charter of 1692, does not in terms extend to the colony of Plymouth, as a rule of positive law. It is equally true, that the general laws of each did not become common to all, because the act of 1692 (Ancient Charters &c., 213, 229) provides, that all the local laws, made by the late governor and company of Massachusetts Bay, and the late government of New Plymouth, not repugnant &c., shall continue in force, *for the respective places* for which they were made and used. But though the rule in question cannot be traced to this source, as a rule of positive law, we are of opinion that it is still a settled rule of property in every part of the State and founded upon a basis quite as firm and immova-ble ; that being a settled rule of property, it would be extremely injurious to the stability of titles, and to the peace and interest of the community, to have it seriously drawn in question. It is founded upon a usage and practice so ancient, immemorial and unvarying, that without tracing its precise origin, it must now be deemed a rule of common law proved by such usage.

It would undoubtedly be a curious subject of investigation, to inquire how the difference came to be established in these colonies, between the rule of law, as to the property in shores and flats where the sea ebbs and flows, and that of the common law of England. There the rule is, that the right of property to high-water mark is in the crown, but it is deemed to be so held, in trust for the use and benefit of all the king's subjects, and therefore such right of property cannot be granted by the crown to a subject. But where the reason ceases, the rule also ceases, and of course a very different rule would prevail, in cases of grants of extensive foreign domains, by the crown, to large companies, where the obvious intent, purpose and end of the grant is not merely to vest the crown's right of property in the grantees, but also to invest them with large civil and political powers, with a view to the establishment and maintenance of civil government, under the general allegiance of the crown. There it would be proper and almost necessary, that with the right of property there should be granted to the community to be governed, such a portion of the sovereign rights and prerogatives, as would be sufficient to make the grant most beneficial to the community to be formed and protected under the government so to be established. And accordingly, in this spirit, and conformably to such views, the early royal grants and charters were framed, under which these colonies were settled. In that of James 1, of November 1620, to the council of Plymouth, upon the basis of which most of the others were framed, there is granted not only the soil described, but also all havens, ports, rivers, waters, fishings, mines and minerals, as well royal as other mines &c., and all and singular other commodities, jurisdictions, *royalties*, privileges, franchises and preëminencies, both within the said tract of land upon the main, and also within the islands and seas adjoining.

It seems therefore clear, that under such grants and charters the right and jurisdiction of the crown, in the seashores, was transferred and vested in the colonial governments formed under such charters, to be applied and administered in such manner as they might deem best calculated to advance the prosperity of the colonists. It seems best to have suited the views of policy and expediency of the colonists here,

to treat the soil in the extensive seashores and flats of our maritime frontier, as the property of the riparian proprietor, subject to certain modifications, because such has been the uniform practice. This was determined in Massachusetts by *the early colonial ordinance already alluded to.* The colony of Plymouth had full authority to adopt the same rule, if it was thought expedient by their government. This might be done, either by making all private grants, which must have been derived from the colonial government, where they bounded upon tide waters, extend to low-water mark, or it might have been done by a general ordinance or declaration, as in Massachusetts. No such ordinance has been found ; but it is much to be regretted, that the general laws of the Plymouth colony, laws which deeply affect the right of property in a large and important part of the commonwealth, have not been published and are so little known. But although we cannot now point to the specific legislative act or ordinance by which this principle was established, yet, as before stated, a usage of two centuries, uniform and unbroken, as far as can now be ascertained, must be taken as sufficient evidence, that such a principle was adopted by those who had the right and power of establishing it, in such form as to give it the force and effect of a rule of law, not now to be shaken. This rule has been recognised as existing in Maine and Plymouth colony, as well as in Massachusetts, not indeed as a point adjudicated, because we believe it was not called in question, but assumed and acted on as a settled rule. *Storer* v. *Freeman*, 6 Mass. R. 435 ; *Parker* v. *Smith*, 17 Mass. R. 413 ; *Lapish* v. *Bangor Bank*, 8 Greenl. 85. And we consider this as applying to the shores of the open sea, as well as to bays, coves and rivers, the language of the colony ordinance being, " in all creeks, coves and other places, about and upon salt water, where the sea ebbs and flows."

Another question was made, whether the plaintiff was owner of that part of the shore upon which the timber first lodged. The case shows that the plaintiff was formerly the owner of a farm, described as bounded easterly by the sea, including the two pieces conveyed to the United States for

a lighthouse, and still continued to own all not so conveyed. It is a settled rule of law upon this subject, that a riparian proprietor, with shore or flats adjoining, may convey his upland without his flats, or his flats without his upland, and therefore, whether upon the conveyance of the upland the flats pass as appurtenant, is to be determined by the intent, as ascertained by the terms and construction of the conveyance. By the terms of the grant to the United States, taken in connexion with a plan of the land, we are of opinion that the flats and beach did not pass with the upland, and that the title to them remained in the plaintiff.

Considering it as thus established, that the place upon which this timber was thrown up and had lodged, was the soil and freehold of the plaintiff, that the defendants cannot justify their entry, for the purpose of taking away or marking the timber, we are of opinion that such entry was a trespass, and that as between the plaintiff and the defendants, neither of whom had or claimed any title except by mere possession, the plaintiff had, in virtue of his title to the soil, the preferable right of possession, and therefore that the plaintiff has a right to recover the agreed value of the timber, in his claim of damages.