Edward B. BELL, et al.

v.

TOWN OF WELLS, et al.

Supreme Judicial Court of Maine.

Argued March 4, 1986.

Decided May 23, 1986.

Curtis Thaxter Stevens Broder & Micoleau, Sidney St. F. Thaxter (orally), Nancy C. Ziegler, Sharon M. Lawrence, Portland, for plaintiff.

Verrill & Dana, Michael T. Healy, William C. Knowles, Portland, for Town of Wells.

James E. Tierney, Atty. Gen., Paul Stern, Asst. Atty. Gen. (orally), Augusta, for Bureau of Public Lands.

Richardson, Tyler & Troubh, Harrison L. Richardson (orally), Elizabeth C. Stouder, Portland, for Moody Beach Tier II Group.

Before NICHOLS, ROBERTS, VIOLETTE, WATHEN, GLASSMAN and SCOLNIK, JJ.

GLASSMAN, Justice.

The plaintiffs, each an owner of shorefront property in the Moody Beach area of the Town of Wells (Town), appeal from the judgment of the Superior Court, York County, granting the motion of the State and the Town to dismiss the plaintiffs' quiet title actions as barred by sovereign immunity. Because we hold that sovereign immunity is not applicable in the instant case, we vacate the judgment.

## I. Procedural History

The plaintiffs brought suit against the Town, the State,[1] and individual unnamed users of the plaintiffs' property who may claim any interest in it.[2] Counts I and II of the complaint are, respectively, a quiet title action at law pursuant to 14 M.R.S.A. §§ 6651–6654 (1980) and a quiet title action at equity pursuant to 14 M.R.S.A. §§ 6655–6658 (1980).[3] In their complaint the plaintiffs make the following allegations: Portions of the plaintiffs' property are located in the intertidal zone, and other portions in the upland above the ordinary high water mark.[4] The plaintiffs hold title to both the intertidal and the upland portions. The public at large has rights of fishing, fowling and navigation in the intertidal portion. In recent years individual unnamed defendants acting under color of right and over the plaintiffs' objections have increasingly used the plaintiffs' property beyond the scope permitted under these public rights. The Town has engaged in a series of actions that have created an apprehension that it or individual users of the plaintiffs' property claim ownership of the plaintiffs' property or rights in it. These actions include removing signs erected on the upland by the plaintiffs, failing to instruct police officers to protect the plaintiffs' property from the individual unnamed defendants' unlawful use, and generally promoting the use of the plaintiffs' property for recreational purposes.

By each count of their complaint, the plaintiffs seek a declaratory judgment pursuant to 14 M.R.S.A. §§ 5951–5963 (1980) that they are vested with title to the upland clear of all claims of the defendants and that the defendants' rights in the intertidal zone are limited to the public rights of fishing, fowling and navigation. The plaintiffs do not seek to extinguish these rights, but to secure declaration as to their nature and scope.

In their respective answers the Town and the State denied that the plaintiffs were entitled to any relief. They raised, *inter alia*, affirmative defenses of estoppel, prescription, implied dedication, custom, and

---

1. The plaintiffs originally named the State Bureau of Public Lands as a defendant. Subsequently, the plaintiffs moved to join the State as a party defendant, and the court granted the motion. We refer to the Bureau and the State collectively as the State.

2. Two environmental organizations, the Natural Resources Council of Maine and the Conservation Law Foundation of New England, Inc., filed motions to intervene as parties defendants. The court granted permissive intervention pursuant to M.R.Civ.P. 24(b).

 Acting on the State's motion, the court appointed a guardian ad litem to represent unnamed or unknown defendants not actually served with process. *See* 14 M.R.S.A. §§ 6654, 6656 (1980).

3. Counts III, IV and V sought relief solely against the Town and are not at issue in the instant appeal.

4. In this opinion we use the term "intertidal zone" to designate the beach area between the ordinary high water mark and either the ordinary low water mark or a line 100 rods seaward of the ordinary high water mark, whichever is nearer to the high water mark. *Cf.* 12 M.R.S.A. § 559(2)(B) (1981). We use the term "upland" to designate the beach area landward of the ordinary high water mark.

acquiescence. In addition, they contended that the public trust doctrine created a right in the public to use the plaintiffs' property for recreational and other purposes.

In June, 1985 the State and the Town filed a motion to dismiss Counts I and II as barred by sovereign immunity. After hearing, the court granted the motion to dismiss. Reciting that it was relying on the *Opinion of the Justices*, 437 A.2d 597 (Me. 1981), and *Cushing v. Cohen*, 420 A.2d 919 (Me.1980), the court held that the State "has an interest in Moody Beach and in that sense it has title" and that since this interest made the State an indispensable party, the quiet title actions were barred by sovereign immunity. The plaintiffs moved pursuant to M.R.Civ.P. 59(e) to alter or amend the decision to confine the dismissal to the allegations with respect to the intertidal portion of the plaintiffs' property. The State and Town opposed this motion on the ground that sovereign immunity barred adjudication of public rights both above and below the high water mark. The court refused to change its prior decision, entered a final judgment as to Counts I and II and stayed further proceedings pending this appeal by the plaintiffs.

On appeal the plaintiffs contend that the State is not an indispensable party in the quiet title actions and that, therefore, sovereign immunity is not applicable. The State and Town contend that on the basis of the affirmative defenses the public enjoys recreational and other rights in the plaintiffs' property and that sovereign immunity prevents any determination either to the contrary or as to the scope of those

rights. The essence of their contention is that when the State *asserts* an interest, of whatever nature, in property, it may prevent a quiet title action by intervening in the litigation and raising the bar of sovereign immunity.

## II. The English Common Law and the Massachusetts Colonial Ordinance

Under settled American judicial construction the following conception of the English common law pertaining to the intertidal zone has prevailed in the United States: By the common law of England that was brought to this country by the earliest settlers, unless title to the intertidal zone was held by private landowners pursuant to grant or prescription or by the crown in its private capacity, the title was vested in the crown which held it in trust for the use of the public. *Shively v. Bowlby*, 152 U.S. 1, 11–13, 14 S.Ct. 548, 551–52, 38 L.Ed. 331 (1894); *Lansing v. Smith*, 4 Wend. 9, 20 (N.Y.1829); *Pike v. Munroe*, 36 Me. 309, 313 (1853). The crown could convey the title to the intertidal zone to private subjects, but the title so conveyed was held subject to the public rights of navigation and fishing. *Shively*, 152 U.S. at 13, 14 S.Ct. at 552; *Lansing*, 4 Wend. at 20–21; *Moulton v. Libbey*, 37 Me. 472, 485–88 (1854). *See also Opinion of the Justices*, 437 A.2d 597, 605 (Me.1981).

We note that this American judicial conception represents a reconstruction by nineteenth-century American judges of the English common law of the sixteenth and seventeenth centuries. Legal scholarship has sharply challenged the accuracy of this judicial reconstruction of the English common law.[5] We need not resolve this contro-

**5.** Legal scholarship has in fact advanced a position completely contrary to the American judicial conception. According to this view, in medieval England the intertidal zone had become the private property of the owner of the adjoining upland subject, however, to certain public rights. The monarchs of the late 16th and early 17th centuries, Elizabeth I, James I, and Charles I, advanced the theory that title to the intertidal zone remained prima facie in the crown and that this presumptive title could be rebutted only by possession of a grant of seashore prop-

erty specifically including the intertidal zone. Except for one aberrant case in the reign of Charles I, English courts up to and including the 1640s, when the Colonial Ordinance of Massachusetts was enacted, rejected the prima facie title theory and decided in favor of private ownership of the intertidal zone by the owner of the adjoining upland. Deveney, *Title, Jus Publicum and the Public Trust: An Historical Analysis*, 1 Sea Grant L.J. 13, 41–50 (1976); 1 H. Farnham, *The Law of Waters and Water Rights* 180–92, 526–28 (1904); S. Moore, *A History of the Fore-*

versy because the Maine common law of the intertidal zone has not developed directly from English common law, but from the Massachusetts Colonial Ordinance of 1641–47. We turn then to the enactment and subsequent history of the Colonial Ordinance.

In 1629 Charles I granted lawmaking power to the Governor and the Company of the Massachusetts Bay Colony. The Charter of Massachusetts Bay (March 4, 1629), *reprinted in* R. Perry, *Sources of our Liberties* 82, 89 (1960). In 1641 the General Court of the Massachusetts colony enacted the Body of Liberties. Section 16 of this enactment provided for public fishing and fowling rights in the intertidal zone while leaving open the question of title:

> Every Inhabitant that is an howse holder shall have free fishing and fowling in any great ponds and Bayes, Coves and Rivers, so farre as the sea ebbes and flowes within the presincts of the towne where they dwell, unlesse the free men of the same Towne or the Generall Court have otherwise appropriated them, provided that this shall not be extended to give leave to any man to come upon others proprietie without there leave.

Massachusetts Body of Liberties § 16 (December 10, 1641), *reprinted in* R. Perry, *supra*, at 148, 150. In response to a public demand for a more comprehensive codification, the General Court labored over a period of three years from 1645 to 1648 to compile, revise and supplement its statutes. In October 1648 the General Court concluded its work and ordered the codification to be printed.[6] Under the heading "Liberties Common," the codification provides in pertinent part:

> Everie Inhabitant who is an hous-holder shall have free fishing and fowling, in any great Ponds, Bayes, Coves and Rivers so far as the Sea ebs and flows, within the precincts of the town where they dwell, unles the Free-men of the same town, or the General Court have otherwise appropriated them. Provided that no town shall appropriate to any particular person or persons, any great Pond conteining more then ten acres of land: and that no man shall come upon anothers proprietie without their leave otherwise then as heerafter expressed; the which clearly to determin, it is declared that in all creeks, coves and other places, about and upon salt water where the Sea ebs and flows, the Proprietor of the land adjoyning shall have proprietie to the low water mark where the Sea doth not ebb above a hundred rods, and not more wheresoever it ebs farther. Provided that such Proprietor shall not by this libertie have power to stop or hinder the passage of boats or other vessels in, or through any sea creeks, or coves to other mens houses or lands. And for great Ponds lying in common though within the bounds of some town,

*shore* 169–311, 638–56 (3d ed. 1888); Taylor, *The Seashore and the People,* 10 Cornell L.Q. 303, 305–309, 315–16, 326–28 (1925); Comment, *Coastal Recreation: Legal Methods for Securing Public Rights in the Seashore,* 33 Me.L.Rev. 69, 74–77 (1981). *See also* 1 *Waters and Water Rights* §§ 36.3(A), 40.1 (R. Clark ed. 1967). One scholar has noted: "Up to the time of the American Revolution, excepting the [one case in the reign of Charles I], there are no English cases definitely holding that the foreshore [i.e., the intertidal zone] was owned not by the upland proprietor but by the crown." Taylor, *supra,* at 307. However, the prima facie title theory was finally accepted by English courts in the early 19th century and is currently valid law in England. 1 Farnham, *supra,* at 192–94; Comment, *supra,* at 76 n. 42.

In light of the disputed interpretations of the English common law of the intertidal zone, it is impossible to determine whether the Colonial Ordinance of Massachusetts codified, modified, or abrogated the common law. We do not purport to settle this controversy, but note that the uncertainty makes highly problematic any application to the Colonial Ordinance of rules of construction pertaining to grants from the sovereign or statutes in derogation of the common law.

6. On the preparation and enactment of the 1648 codification, *see* Barnes, *Introduction,* in *The Book of the General Lawes and Libertyes Concerning the Inhabitants of Massachusetts* (Cambridge, Mass., 1648; facsimile reprint, T. Barnes ed. 1975); G. Haskins, *Law and Authority in Early Massachusetts* 36–37, 131–36 (1960).

it shall be free for any man to fish and fowl there, and may passe and repasse on foot through any mans proprietie for that end, so they trespasse not upon any mans corn or meadow. [1641 1647]

Liberties Common § 2, *The Book of the General Lawes and Libertyes Concerning the Inhabitants of Massachusetts* 35 (Cambridge, Mass., 1648; facsimile reprint, T. Barnes ed. 1975) (years in brackets in the original).[7]

Section 16 of the 1641 Body of Liberties as amended by the 1648 *Book of the General Lawes and Libertyes* came to be called the Colonial Ordinance of 1641–47. *See* J. Whittlesey, *Law of the Seashore, Tidewaters and Great Ponds in Massachusetts and Maine* xxxv–xi (1932). The Colonial Ordinance in its 1648 form was republished in the 1660 and the 1672 revisions of the Massachusetts Bay Colony Laws. *Id.* at xxxvii–xxxix. Although the ordinance as positive statutory law may have been annulled by the abrogation of the Colonial Charter, nevertheless, it continued as part of the common law of Massachusetts. *Storer v. Freeman,* 6 Mass. 435, 438 (1810).[8] *Storer* involved a claim of trespass on intertidal lands located in Cape Elizabeth in the then District of Maine. Writing for a unanimous court, Chief Justice Parsons noted that under the Colonial Ordinance the proprietor of the upland holds title to the low water mark or to 100 rods seaward of the high water mark, whichever is less. The ordinance continues

as a "usage" that now "has force as our common law." *Id.* at 438. In *Barker v. Bates,* 30 Mass. (13 Pick.) 255 (1832) (Shaw, C.J.), the defendant in a trespass action raised the question whether the Colonial Ordinance applied to that part of the Commonwealth that had formerly been a part of the Plymouth Colony. The court agreed that the Colonial Ordinance did not extend to the Colony of Plymouth as a rule of positive law, but held that it applied to the entire Commonwealth as a rule of common law:

> [T]hough the rule in question cannot be traced to this source [i.e., the Ordinance], as a rule of positive law, we are of the opinion that it is still a settled rule of property in every part of the State and founded upon a basis quite as firm and immovable; that being a settled rule of property, it would be extremely injurious to the stability of titles, and to the peace and interests of the community, to have it seriously drawn in question. It is founded upon a usage and practice so ancient, immemorial and unvarying, that without tracing its precise origin, it must now be deemed a rule of common law proved by such usage.

*Id.* at 258.

Thus, the Colonial Ordinance was a rule of Massachusetts common law at the time of the separation of Maine from Massachusetts. By force of article X, § 3 of the Maine Constitution[9] and of section 6 of the Act of Separation between Maine and Mas-

---

7. Under the heading "Liberties Common," the *Book of the General Lawes and Libertyes* has three sections. Section 1 declares the right of free speech of "Inhabitant or Forreiner, Free or not Free" in public assemblies. Section 2 is quoted in full in the text of the opinion. Section 3 provides that "[e]very man" has liberty to remove himself and his family from the Massachusetts Bay Colony.

8. *See also Austin v. Carter,* 1 Mass. 231 (1804). In *Austin* the Attorney General of Massachusetts, arguing for the plaintiff in a trespass case, contended that the land to the low water mark belongs to the owner of the adjoining upland and that all inhabitants of the Commonwealth

have the "right to pass and repass" on the tidal waters so long as the owner of the adjoining upland leaves the intertidal zone unenclosed. *Id.* at 232. The report of the decision notes that the court was unanimously of the same opinion on these two issues "which they said had been repeatedly *so* decided." *Id.* (emphasis in original).

9. Article X, § 3 provides:
 All laws now in force in this State, and not repugnant to this Constitution, shall remain, and be in force, until altered or repealed by the Legislature, or shall expire by their own limitation.

sachusetts,[10] it must be regarded as incorporated into the common law of Maine. *See Davis v. Scavone*, 149 Me. 189, 192–95, 100 A.2d 425, 427–28 (1953) (English statute pertaining to the sale of estate property by executors, 21 Henry VIII, ch. 4, is part of the Maine common law by force of article X, § 3 and the Act of Separation). In *Lapish v. Bangor Bank*, 8 Me. 85 (1831), the defendant in an action for a writ of entry contended that the Colonial Ordinance had never been in force in Maine. *Id.* at 91, 93. Writing for a unanimous court, Chief Justice Mellen rejected this contention:

> Ever since [the decision in *Storer v. Freeman* ], as well as long before, the law on this point has been considered as perfectly at rest; and we do not feel ourselves at liberty to discuss it as an open question.

*Id.* at 93. Similarly, in *Barrows v. McDermott*, 73 Me. 441 (1882), a landowner seeking to prevent access to a great pond contended that the Colonial Ordinance did not apply to that part of the State that falls within the limits of the former Acadia Colony. *Id.* at 447. Rejecting this contention, the court declared that public and judicial acceptance and recognition of long standing had given the Ordinance full power throughout the State:

> But [the Colonial Ordinance] has been so often and so fully recognized by the courts both in this State and in Massachusetts as a familiar part of the common law of both, throughout their entire extent, without regard to its source or its limited original force as a piece of legislation for the colony of Massachusetts Bay, that we could not but regard it as a piece of judicial legislation to do away with any part of it or to fail to give it its due force throughout the State until it shall have been changed by the proper

law making power. When a statute or ordinance has thus become part of the common law of a State it must be regarded as adopted in its entirety and throughout the entire jurisdiction of the court declaring its adoption.

> It is not adopted solely at the discretion of the court declaring its adoption, but because the court find that it has been so largely accepted and acted on by the community as law that it would be fraught with mischief to set it aside.

> It is not here and now a question whether this ordinance shall be adopted with such modifications as might. be deemed proper under the circumstances of the country. It has been long since adopted in all its parts, acted upon by the whole community and its adoption declared by the courts; and now the argument of the plaintiff's counsel aims to have us declare either that it has not the force of law in certain parts of the State, or that the court may change it if satisfied that it does not operate beneficially under present circumstances. We cannot so view it. That which has the force of common law in one county in this State has the same force in all.

*Id.* at 448–49 (citations omitted). *Accord Conant v. Jordan*, 107 Me. 227, 230, 77 A. 938, 939 (1910).

We turn then to an analysis of the text of the Colonial Ordinance as a vital part of our common law. The Ordinance initially provides that every inhabitant has a right of fishing and fowling in the intertidal zone. *Liberties Common* § 2, *Book of the General Laws and Liberties* at 35 (spelling and capitalization modernized). This right is qualified by a clause prohibiting trespass: "[p]rovided ... that no man shall come upon another's propriety without their leave otherwise then as hereafter expressed." *Id.* The Ordinance then de-

---

**10.** The Act of Separation § 6 provides: "That all the laws which shall be in force within said District of Maine, upon the said fifteenth day of March next, shall still remain, and be in force, within the said proposed State, until altered or repealed by the government thereof, such parts only excepted as may be inconsistent with the situation and condition of said new State, or repugnant to the Constitution thereof." Mass. Laws 1819, ch. 161, quoted in S. Silsby, *History of Statutory Law in the State of Maine* 4 n. 3, 5 (1965).

clares the title ownership of the intertidal zone to be in the proprietor of the adjoining upland. The title ownership extends "to the low water mark where the sea does not ebb above a hundred rods, and not more wheresoever it ebbs farther," and is further qualified by the Ordinance's declaration of a public right of navigation. *Id.* Thus, under the Colonial Ordinance the owner of the upland holds title in fee simple to the adjoining intertidal zone [11] subject to the public rights expressed in the Ordinance. *Marshall v. Walker,* 93 Me. 532, 536, 45 A. 497, 498 (1900); *Snow v. Mt. Desert Island Real Estate Co.,* 84 Me. 16–17, 24 A. 429, 429–30 (1891); *Pike,* 36 Me. at 313.[12] Because the Colonial Ordinance is an integral part of the common law of Maine and Massachusetts, these two states do not recognize the general American rule that a coastal state presumptively holds title to the intertidal zone.[13] *See Shively,* 152 U.S. at 14–26, 52–58, 14 S.Ct. at 553–57, 567–69; 1 *Waters and Water Rights* §§ 36.3(B)–(C), 42.1 (R.Clark ed. 1967). We turn then to examine the effect of the Colonial Ordinance and our cases construing it on the instant quiet title actions.

### III. Maintenance of the Quiet Title Actions

 In the instant case the plaintiffs invoked the Declaratory Judgments Act, 14 M.R.S.A. §§ 5951–5963 (1980), as a procedural vehicle for defining rights in real property. The Act is remedial in nature and should be liberally construed to provide a simple and effective means by which parties may secure a binding judicial determination of their rights. *Hodgdon v. Campbell,* 411 A.2d 667, 669 (Me.1980). While the source of jurisdiction to quiet title is found in the quiet title provisions, 14 M.R.S.A. §§ 6651–6662 (1980 & Supp.1985–1986), the Declaratory Judgments Act creates a more adequate and flexible remedy, avoiding the "arcane intricacies found in the procedural requirements" of the quiet title provisions. *Hodgdon,* 411 A.2d at 669. We have noted that a declaratory judgment proceeding is "a particularly efficacious method for quieting title to real property." *Id.* at 669–70. The plaintiffs in the instant case have the burden of proving title in themselves both to the intertidal zone and the upland. *Id.* at 671. The State and Town, however, bear the burden of proving their affirmative defenses asserting the existence of a public right to use the intertidal zone and the upland for recreational purposes. M.R.Civ.P. 8(c); *Hodgdon,* 411 A.2d at 670–71 ("The party who asserts the affirmative of the controlling issues in the case, whether or not he is the nominal plaintiff in the action, bears the risk of non-persuasion."). Recognizing, however, that the Declaratory Judgments Act alone does not override sovereign immunity when that doctrine is properly applied, we turn then to examine the determinative question in the instant appeal: does the doctrine of sovereign immunity bar this suit? *Cf. Drake v. Smith,* 390 A.2d 541, 544 (Me. 1978).

 We first examine whether the State's interest, if any, in the intertidal zone is such as would make it an indispens-

---

**11.** This statement represents the general rule in this State. By specific language in deeds an owner may, of course, convey the upland without the intertidal zone, or the intertidal zone without the upland. *Storer v. Freeman,* 6 Mass. 435, 439 (1810); *Snow v. Mt. Desert Island Real Estate Co.,* 84 Me. 14, 18, 24 A. 429, 430 (1891).

**12.** *See also* 12 M.R.S.A. § 6072(1), (4)(F) (1981 & Supp.1985–1986) (an application to receive a lease for research or aquaculture purposes of "areas in, on and under the coastal waters" shall "[i]nclude written permission of every riparian owner whose land to the low water mark will be actually used").

**13.** Because the rule of title ownership in Maine reverses the rule prevailing in all other states except Massachusetts and, possibly, New Hampshire, precedents from other American jurisdictions pertaining to the scope of the public rights in the intertidal zone must be used with caution. *See* 1 *Waters and Water Rights* §§ 36.3(C), 42.1 at 266 n. 11 (R. Clark ed. 1967) (discussing the divergence of Massachusetts, Maine, and, possibly, New Hampshire, from the general American rule).

able party in this case. As the foregoing discussion of the Colonial Ordinance makes clear, the plaintiffs and not the State presumptively hold the fee simple title to the intertidal zone at Moody Beach.[14] The plaintiffs' title is subject to the public right of use declared by the Colonial Ordinance. The 1648 *Book of the General Lawes and Libertyes*, as indicated above, designated this right as a "Liberty Common," a category that included only two other rights: a right of free speech in public assemblies and a right to leave the colony. Thus under the Colonial Ordinance the public right to use the intertidal zone was seen in terms of an individual freedom. As Chief Justice Shaw wrote, the "great purpose" of the enactment was "to declare a great principle of public right, to abolish the forest laws, the game laws, and the laws designed to secure several and exclusive fisheries and to make them all free." *Commonwealth v. Alger*, 61 Mass. (7 Cush.) 53, 68 (1851). The Colonial Ordinance did not designate who "owned" or "held" the right to use the intertidal zone, just as we would not attempt to designate who "owns" freedom of speech.

█ In *Marshall v. Walker*, 93 Me. 532, 45 A. 497 (1910), we characterized the public right under the Colonial Ordinance to use the intertidal zone for navigation and fishing to be an easement. *Id.* at 536, 540, 45 A. at 498, 499. *See also Hill v. Lord*, 48 Me. 83, 99 (1861) ("Aquatic rights, of whatever kind, when held by those not owning the soil, are considered easements."); Comment, *The Public Trust Doctrine in Maine's Submerged Lands: Public Rights, State Obligation and the Role of the Courts*, 37 Me.L.Rev. 105, 112 (1985) (public easement in the intertidal zone).[15] Characterizing the public right to use the intertidal zone as a public easement is in accord with the doctrine, long accepted in Maine, that the public at large is capable of

---

**14.** In holding that the State "has an interest in Moody Beach and in that sense it has title," the Superior Court recited that it relied on the *Opinion of the Justices*, 437 A.2d 597 (Me.1981). The reliance was misplaced. We note preliminarily that an advisory opinion rendered by the justices pursuant to Me. Const. art. VI, § 3, represents the opinion of individual justices and is not binding upon this court. *Martin v. Maine Savings Bank*, 154 Me. 259, 269, 147 A.2d 131, 137 (1958).

In addition, the focus of the instant case fundamentally diverges from the focus of the 1981 *Opinion of the Justices*. In the instant case the fee ownership of the intertidal zone and the upland at issue can be determined, and no party seeks to release or extinguish State claims of fee ownership. In sharp contrast the justices in the 1981 *Opinion* addressed a factual situation in which, according to legislative findings, fee ownership as between the State and the private owners could not be determined in certain areas because portions of the submerged land, ordinarily held in fee by the State, and the intertidal land, ordinarily held in fee by the private owners, had been filled and were no longer below water or subject to tidal action. Documentation was lacking to determine the primitive high and low water marks. *Opinion of the Justices*, 437 A.2d at 605, 607–608. Thus, the Legislature could reasonably have concluded that a case-by-case resolution of the fee ownership would be protracted, costly and ineffective. *Id.* at 608. The Legislature further found that the intertidal and submerged lands that were filled prior to October 1, 1975, were now substantially valueless for public use and an expectation of private ownership had developed in both the private parties who had long relied on their title to the filled land and in the municipalities that had taxed that land to the private parties. *Id.* The Legislature therefore released the lands filled as of October 1, 1975, from any claims of State ownership. *See* 12 M.R.S.A. § 559(3) (1981). The justices specifically addressed the constitutionality of this release under the legislative powers clause, Me. Const. art. IV, pt. 3, § 1. Reasoning that the clearing of title, so that commercial and other activity may go forward, is a legitimate and important public purpose and that the legislative findings, recited above, were reasonable, the justices concluded that the release of claims of state ownership did not violate the legislative powers clause. *Opinion of the Justices*, 437 A.2d at 606–10. The justices declined to answer questions posed as to the existence of a trust responsibility on the part of the State in intertidal land, the rights of the beneficiaries and the responsibilities of the trustees. *Id.* at 599–600, 610–11.

**15.** We note that other courts have characterized the public right to use the intertidal zone as an easement. *E.g., Brickell v. Trammel*, 77 Fla. 544, 559, 82 So. 221, 226 (1919); *Butler v. Attorney General*, 195 Mass. 79, 84, 80 N.E. 688, 689 (1907); *Commonwealth v. Alger*, 61 Mass. (7 Cush.) 53, 81 (1851).

acquiring a non-possessory interest in land. *Town of Manchester v. Augusta Country Club*, 477 A.2d 1124 (Me.1984); *Littlefield v. Hubbard*, 124 Me. 299, 302–304, 128 A. 285, 287–88 (1925). *Treat v. Lord*, 42 Me. 552 (1856), involved the distinction between state ownership and a public easement. By legislative resolve and deed Massachusetts conveyed land located in the then District of Maine to the plaintiffs' predecessor in title. *Id.* at 559–60. While the resolve and deed conveyed all of the Commonwealth's property rights in the land over which a navigable stream passed, it did not convey the public easement to use the stream for the passage of logs despite the "right" of the Commonwealth "to control, abridge, or even destroy such easement ... by virtue of its sovereignty, or right of eminent domain." *Id.* at 560. Thus in *Treat* we rejected the contention that Massachusetts as sovereign held the public easement and had the power to convey it by conveying "all its *right, title and interest in and to* the land." *Id.* (emphasis in original). Similarly, in regard to the intertidal zone, we have never indicated that any entity other than the public at large "owns" or "holds" this public easement and see no need to do so in the instant case.

■ Nor can the State contend that it is a trustee of the public easement in the intertidal zone at Moody Beach. A trustee is a person or entity that holds trust property for the benefit of another. 1 G. Bo-

gert, *The Law of Trust and Trustees* § 1 at 4–5 (2d ed. rev. 1984). Accordingly, we have stated that the State *holds the title ownership* of the public lots and great ponds *as a trustee* for the public. *E.g., Cushing v. Cohen*, 420 A.2d 919, 923 (Me. 1980) (public lots); *Conant v. Jordan*, 107 Me. 227, 230, 77 A. 938, 939 (1910) (great pond). Here, however, because the plaintiffs and not the State hold the fee simple title, the trustees, if any, of Moody Beach would be the plaintiffs. We do not, however, need to decide that point. Instead, in this case in which the plaintiffs do not seek to have the public easement in the intertidal zone extinguished, but to have its scope and nature declared, the questions are who may seek enforcement of that easement and by what means.

■ In the instant case it is clear that the Town would have standing as a plaintiff to assert the public easement in the intertidal zone. *Augusta Country Club*, 477 A.2d at 1128–29.[16] An individual defendant may assert the public easement under the Colonial Ordinance as a defense in a trespass or quiet title action. *E.g., Andrews v. King*, 124 Me. 361, 129 A. 298 (1925) (trespass); *Marshal v. Walker*, 93 Me. 532, 45 A. 497 (1900) (quiet title action). Accordingly, we have permitted a great variety of actions involving claims to title or possession of the intertidal zone to proceed in the State's absence, including most notably at least two quiet title actions.[17]

**16.** *Augusta Country Club* left open the question as to whether individual members of the public as well as a legally organized political entity have standing to bring suit to establish a public easement. *Id.* at 1129 n. 6.

**17.** *Hodgdon v. Campbell*, 411 A.2d 667, 671–72 (Me.1980) (quiet title action to determine location of boundary on upland, but also involving intertidal zone); *Marshall v. Walker*, 93 Me. 532, 45 A. 497 (1900) (quiet title action to intertidal zone and adjoining upland). *See also Boothbay Harbor Condominiums, Inc. v. Dep't of Transportation*, 382 A.2d 848 (Me.1978) (apparently a quiet title action; because the plaintiff failed to prove that the dam was built on land above the low water mark, the plaintiff did not meet its burden of proving title); *Ginn v. Ulmer*, 105 Me. 286, 74 A. 635 (1909) (quiet title action involving

shorefront property; not clear whether the action involved the intertidal zone). Possessory actions involving the intertidal zone have included the writ of right, *Knox v. Pickering*, 7 Me. 106 (1830); writs of entry to recover possession of lands, *Procter v. Maine Central R.R. Co.*, 96 Me. 458, 52 A. 933 (1902); *Pike v. Munroe*, 36 Me. 309 (1853); *Winslow v. Patten*, 34 Me. 25 (1852); *Deering v. Proprietors of Long Wharf*, 25 Me. 51 (1845); real actions to recover possession, *Ogunquit Beach District v. Perkins*, 138 Me. 54, 21 A.2d 660 (1941); *Snow v. Mt. Desert Real Estate Co.*, 84 Me. 14, 24 A. 429 (1891); and petitions for partition of land in the intertidal zone, *Brackett v. Persons Unknown*, 53 Me. 238 (1861); *Partridge v. Luce*, 36 Me. 16 (1853).

Since intertidal lands in Massachusetts as in Maine are subject to the Colonial Ordinance, we

To depart from these precedents at this late date would be a drastic step incompatible with the doctrine of stare decisis and the stability of the legal concepts of property in the State.

■ Because the State does not assert any title in the intertidal zone, because the public rights of use constitute an easement in the public at large that may be asserted by the Town and individual defendants, and because we have consistently permitted title and possessory actions pertaining to the intertidal zone to proceed in the State's absence, we hold that the State is not an indispensable party. *See* M.R.Civ.P. 19(b).[18] Since the State is not an indispensable party, the court erred by its ruling that sovereign immunity barred the quiet title actions to the intertidal zone.

Since the quiet title actions to the intertidal zone at Moody Beach are not barred, *a fortiori*, the quiet title actions to the upland are not barred. In reviewing an order of the trial court granting a motion to dismiss, we consider all well-pleaded material allegations of the complaint as admitted. *Culbert v. Sampson's Supermarkets Inc.*, 444 A.2d 433, 434 (Me.1982). The plaintiffs have alleged that they are vested with title in fee simple absolute to the upland at Moody Beach, clear of any claim of the public. There is no allegation that the State claims any interest in the upland. In the absence of such a showing the doctrine of sovereign immunity is simply irrel-

evant because the State is not a real party in interest in its sovereign capacity or otherwise. *See Cushing v. Cohen*, 420 A.2d 919, 923 (Me.1980) ("We conclude ... that the real party in interest in this case is the State of Maine as sovereign...."). On remand the defendants may by proof at trial establish the public right, if any, to use the upland, and the scope of the public right to use the intertidal zone. *See Augusta Country Club*, 477 A.2d at 1128–30 (discussing common methods of proving that the public at large has acquired a non-possessory interest in land).

The alternative to our vacating the order granting the motion to dismiss Counts I and II would be to permit any State agency at its whim to block any quiet title action, whether in the intertidal zone, on the upland or elsewhere, by asserting an unproven interest. Such an approach is illogical because it assumes the merits—the existence of the State's interest—in order to avoid litigating the merits. Moreover, such a result would represent a radical assault on the stability of title to real property within this State and the availability of legal remedies to defend it.

*Cushing v. Cohen*, 420 A.2d 919 (Me. 1980), relied on by the State and Town, is not to the contrary. In *Cushing* the State held the fee title to the lands in question and had granted cutting rights on them. *See id.* at 921. The State held the land as trustee for the public, and both the title

---

have extensively surveyed Massachusetts precedents. Our research has failed to disclose any case in which the Commonwealth was held to be an indispensable party in actions involving claims to title or possession of the intertidal zone. *Compare Michaelson v. Silver Beach Improvement Ass'n*, 342 Mass. 251, 173 N.E.2d 273 (1961) (plaintiffs, shorefront property owners, receive title in a beach created artifically by the Commonwealth's dredging and dumping of the dredged material; the defendant association and its members are enjoined against use of the beach) *with Executive Air Service, Inc. v. Div. of Fisheries & Game*, 342 Mass. 356, 173 N.E.2d 614 (1961) (Commonwealth holds *title ownership* of the land and is therefore the real party in interest; the suit is barred by sovereign immunity).

18. In the language of M.R.Civ. 19(b), "a judgment rendered in the [State's] absence will be adequate" to define the scope of the public rights at Moody Beach since the State does not claim any interest distinct from the interest of the Town and the individual defendants. Similarly, a judgment rendered in its absence will not be "prejudicial to [the State] or those already parties" since the Town and the individual defendants may assert the public rights of use. Finally, it is unlikely that "the plaintiff[s] will have an adequate remedy if the action is dismissed for nonjoinder" of the State since in that eventuality the plaintiffs may have to resort repeatedly to trespass or nuisance actions against the Town and individual defendants. Such actions would involve relitigation of the substantive legal issues in the instant case.

and the trustee relationship were apparent on the basis of existing law. *See id.* at 923; *see also State v. Mullen,* 97 Me. 331, 335, 54 A. 841, 843 (1903). Thus, in *Cushing,* the State was clearly the real party in interest based on its title ownership, its clearly established trustee status, and its role as grantor of the interests in question. 420 A.2d at 923. A judgment rendered in its absence could not have been adequate and would have been highly prejudicial to the State. For these reasons the State was an indispensable party in *Cushing,* but is not here.[19]

We hold therefore that the Superior Court erred in dismissing Counts I and II.

 While the State is not an indispensable party in the instant case, we see no reason to prevent the Attorney General's remaining in the case to represent the public interest in Moody Beach. "We recognize that the Attorney General, as the chief law officer of the State, has the power and duty to institute, conduct and maintain such actions and proceedings as he deems necessary for the protection of public rights and to defend against any action that might invidiously interfere with the same." *In re Estate of Thompson,* 414 A.2d 881, 890 (Me.1980); *see also Lund ex rel. Wilbur v. Pratt,* 308 A.2d 554, 558 (Me.1973). The quieting of title at Moody Beach will affect the rights of the public at that beach and may through the persuasive authority of that decision affect public rights at other Maine beaches. Although neither the Colonial Ordinance nor the allegations of the parties disclose any direct interest of the State in the intertidal zone or the upland at Moody Beach requiring it to be a party to this action, the State acting through the Attorney General may decide that the public rights will be more effectively protected through its continued di-

rect intervention than in its absence.[20] *See* M.R.Civ.P. 20(a), 24(b).

Accordingly, the entry is:

Judgment vacated. Remanded for further proceedings consistent with the opinion herein.

All concurring.

---

19. We note that *Cushing* did not hold that sovereign immunity bars a quiet title action. *Cushing* did not involve a quiet title action. Moreover, the precise holding of *Cushing* was that when the State is a real party in interest, the potential applicability of sovereign immunity may not be avoided by camouflaging the action as one against state officials. 420 A.2d at 923, 927–28.

20. We note that in *Butler v. Attorney General,* 195 Mass. 79, 80 N.E. 688 (1907), the Attorney General asserted rights to use the intertidal zone on behalf of the general public.